LUSK, NIXON & BIDDLE, Receivers of ST. LOUIS & SAN FRANCISCO RAILROAD, Appellants, v. PUBLIC SERVICE COMMISSION.

In Banc, March 15, 1919.

1. **APPEAL: Receivers: Improper Joining of Company in Order.** Where the railroad company was a party below, but did not appeal, the receivers cannot on appeal complain that the company was included in the order or judgment below. Error to be reversible must under the statute be "error against the appellant or plaintiff in error."

2. ————: ————: ————: **Not Urged Below.** An objection on appeal that the railroad company was wrongfully included in the order of the Public Service Commission and the judgment of the circuit court, will not be considered in the appellate court if (1) the company in its application for a rehearing before the Commission did not specifically set forth the ground on which it considered the order unlawful, unjust or unreasonable, or (2) if it failed to lay said ground of error in its motion for a new trial or in arrest in the circuit court.

3. **PUBLIC SERVICE COMMISSION: Re-routing Trains: Incident of Train Stoppage.** The Public Service Commission, under the broad terms of the Public Service Act, has power and jurisdiction to require the re-routing of trains where the re-routing is a mere incident of the main thing, namely, the stoppage of such trains in order to render reasonably adequate service to a town, especially where such re-routing is but re-establishing the service formerly rendered by the public utility to such town; and since the Commission has such power, the circuit court, which exercises a jurisdiction in its nature derivative or appellate, has power to adjudge an affirmance of the order.

    *Held*, by WOODSON, J., dissenting, with whom, BOND, C. J., concurs, that the statutes do not confer such power on the Commission; they do not authorize the Commission to compel the re-routing of trains, and if they did the exercise of such power would be unjust, unreasonable and oppressive.

4. ————: ————: **Unreasonable and Arbitrary Order.** For nine years the railroad company ran its south-bound through-passenger day train through Hayti *via* Caruthersville to Grassy Bayou, and its corresponding north-bound train through Grassy Bayou *via* Caruthersville to Hayti. Then it constructed a "cut-off" track between Hayti and Grassy Bayou, a distance of six miles, and ceased to

run said trains *via* Caruthersville, thereby shortening the railway travel between Hayti and Grassy Bayou 9.9 miles, and attempting to accomodate Caruthersville by running numerous local trains to and from Grassy Bayou and Hayti *via* Caruthersville, some of which made connection with the two through day trains and others supplied numerous small branch-line towns and villages. The result was a branch-line railway service for Caruthersville, which is a county seat town of five thousand inhabitants, furnishing to the company a larger passenger and freight business than any other between St. Louis and Memphis except Cape Girardeau. *Held,* that, with these and many other facts in view, the passenger train service at Caruthersville was inadequate and unreasonable, and the order of the Public Service Commission requiring the two day trains to detour at Hayti and Grassy Bayou *via* Caruthersville was neither arbitrary, oppressive, unjust nor unreasonable.

*Held,* by WOODSON, J., dissenting, with whom BOND, C. J., concurs, that the order was unjust, unreasonable and oppressive.

5. ——: ——: ——: **Number of Trains.** On the question of reasonableness and adequacy of train service, the mere number of trains is not of so much importance as are the direction, destination and facilities of the trains listed for service.

6. ——: ——: ——: **Improvement of Track: Neglect.** The fact that it will cost a considerable sum of money to make the detour track as good as the main-line track is of no moment, when it is not made to appear that the detouring of the two slow-moving day trains requires as good a track as the main-line track, and that the condition of track, ties and road bed of the detour track was not due to neglect.

7. ——: ——: ——: **Due Process of Law.** A reasonable and just order of a public service commission requiring adequate and reasonable train service and transportation facilities, at a given town on the railway line, does not impinge upon constitutional guaranties of due process of law and equal protection of the law, where the order is subject to judicial review.

8. ——: ——: **Interstate Commerce.** Where there are (1) no Federal regulations shown by the record covering the subject-matter of the concrete case, (2) the order of the Public Service Commission does not on its face relate to or cover interstate commerce, but relates solely to and is levelled at local and intrastate transportation service and facilities at a named town, and (3) it is self-evident that if the order complained of affects interstate commerce at all it does not do so directly, but only incidentally, the order is not void as an impingement upon interstate commerce, if its enforcement does not as a fact lay an unreasonable burden upon and unduly restrict and interfere with such commerce.

9. ——: ——: ——: **Undue Restrictions.** Where the through passenger travel on the railroad between its terminals (St. Louis and Memphis) is, except in a negligible quantity, taken care of on two heavy and modern night trains, which now and always have run through the "cut-off;" the only trains affected by the order requiring two day trains to make a detour of 9.9 miles. carry few or no through passengers between those terminals; the connections at those terminals for those who use these day trains are not seriously impeded by the order; the two trains, though well equipped, run on exceedingly slow schedule; the town, which by the detour they are required to serve, is a fine, growing and prosperous city and originates more passenger business and travel, in and out, than any other on the 305-mile line except one, and the town by the use of the "cut-off" by the two day trains is relegated to a "branch-line" service, it cannot be held, with any basis of fact, that the order lays an unreasonable or undue restriction on interstate commerce.

*Held*, by WOODSON, J., dissenting, with whom BOND, C. J., concurs, that the two trains are interstate, and an order that requires them to detour seventeen miles out of their direct course for the simple purpose of furnishing the town two additional trains per day, when she already has fourteen, is unjust, unreasonable and oppressive, and unlawfully interferes with interstate commerce.

Appeal from Cole Circuit Court.—*Hon. J. G. Slate,* Judge.

AFFIRMED.

*W. F. Evans, E. T. Miller* and *A. E. Haid* for appellants.

(1) Upon the record the court should have reversed the order of the Public Service Commission as to the railroad company, the record showing that the company was not operating any of the railroad at the time or after the complaint was filed. (2) The court had no power or jurisdiction under the Public Service Law to make the order requiring appellants to re-route their trains 801 and 802. The Commission relies on Sections 49 and 51 of said law for such authority and jurisdiction, but said sections do not support such authority or jurisdiction, nor do any other sections of the Act of 1913. Laws 1913, pp. 577 to 645; C. B. & Q. Rail-

road v. Public Service Commission, 181 S. W. 61. (3) The order of the Commission affirmed by the circuit court is arbitrary, unjust and unreasonable. It attempts to substitute the judgment of the Commission as to operating questions for the judgment of the receivers and the court under which they are acting. It attempts to build up one locality at the expense of another. It disregards the fact that reasonable passenger service is already provided by the receivers at Caruthersville. It deprives appellants of their property without due process of law and without compensation, and denies to them the equal protection of the law, in violation of the Fourteenth Amendment to the Constitution of the United States, and of Sections 21 and 30 of Article 2 of the Constitution of Missouri. C. B. & Q. Railroad v. Public Service Commission, 181 S. W. 61; Illinois Central Railroad v. Illinois, 163 U. S. 142; C. B. & Q. Railroad v. Chicago, 166 U. S. 227; L. S. & M. S. Railroad v. Ohio, 173 U. S. 285; Cleveland Railway v. Illinois, 177 U. S. 514; Mississippi Railroad Com. v. Illinois Central Railroad, 203 U. S. 335; Atlantic Coast Line v. Wharton, 207 U. S. 328; Herndon v. C. R. I. & P. Railroad, 218 U. S. 135; Oregon Railroad & Nav. Co. v. Fairchild, 224 U. S. 510; Gt. Northern Ry. v. Minnesota, 238 U. S. 340. (4) The order of the Commission directly burdens and interferes with interstate commerce, and is therefore void because in conflict with Section 8, Article I, of the Constitution of the United States. Illinois Central Railroad v. Illinois, 163 U. S. 142; McNeil v. Southern Railway, 202 U. S. 543; Atlantic Coast Line v. Wharton, 207 U. S. 328; Herndon v. C. R. I. & P. Railroad, 218 U. S. 135; Kansas City Southern Railway v. Kaw Valley District, 233 U. S. 75; C. B. & Q. Railroad v. Wisconsin, 237 U. S. 220.

*Alex Z. Patterson,* General Counsel, *James D. Lindsay,* Assistant Counsel and *R. L. Ward,* of Counsel for respondent.

(1) Appellants failed to set forth in their application for a rehearing before respondent their ground for

reversal here urged, to-wit, that the order of respondent should not be made to apply to the railroad company, since such company was not operating any of the railroad at the time the complaint was filed or thereafter. Such failure absolutely precludes appellants from relying on this ground now. Sec. 110, Public Serv. Act.   (2) Appellants likewise failed to urge this ground of reversal before the Circuit Court. No allegation or contention to this effect is contained in appellants' petition for *certiorari,* nor is such ground set up in appellants' motion for new trial or motion in arrest in the circuit court. (3)   The comprehensive terms of Sections 49 and 51 of the Public Service Law gave the Commission full power to require the operation of trains 801 and 802 through Caruthersville, since such sections expressly give the Commission power to order "additional facilities" or to direct "changes in any thereof in use."   (4)   It is now well established that it is proper for a state to provide by statute, or direction of a legislative commission, for local improvements of facilities, or for the adoption of reasonable measures in the interest of the health, safety and welfare of the public, notwithstanding the fact that such regulations may incidentally and indirectly involve interstate commerce. Note, 14 L. R. A. (N. S.) 293; 5 Ruling Case Law, sec. 34; South Covington v. Covington, 35 Sup. Ct. Rep. 158. (5)   The proof in this case established the fact that trains 801 and 802 were primarily and principally devoted to intrastate service. Being so devoted, and appellants not having otherwise furnished adequate local service to Caruthersville and vicinity, the order of the Commission was not an unlawful interference with interstate commerce. Mississippi Railroad Co. v. Illinois Central, 203 U. S. 335; Herndon v. Railway Co., 218 U. S. 135; Atlantic Coast Line v. Wharton, 207 U. S. 328.   (6)   From the proof it conclusively appears that the passenger-train service given Caruthersville by appellants' local and branch line trains was wholly inadequate and unreasonable, when the impor-

tance of the city and the extent of the needs of the public of that city and locality were considered.

LAMM, Special Judge.—A statement of the facts pertinent to the decision of questions raised on this appeal will appear in connection with rulings on those questions. However, it has seemed sensible to fetch a small compass by way of an outline of the case *in limine,* to the end that it may have an understandable setting for discussion, thus:

The mayor and aldermen of Caruthersville, on behalf of that city and its people (and *virtute officii*), filed a complaint with respondent Commission of three specifications, in substance, to-wit:

First: It was charged that appellants, unmindful of the safety of the people, operate certain passenger trains into and out of Caruthersville, by backing them. (After complaint filed, this method of train operation was discontinued, as we gather, hence the foregoing was abandoned at the hearing and will not be further noticed).

Second: It was charged that a certain local pas-senger train, operating from Kennett, Missouri, to Memphis, Tennessee *via* Caruthersville, was run on a schedule creating unnecessary lay-overs, inconveniences and reductions of traffic. (The grievances complained of in this specification seem to relate to conditions in Arkansas, hence the finding of respondent Commission was against complainants thereon, and, as no appeal was taken by the mayor and board of aldermen, it drops out of the case and will not be further noticed).

Third: It was charged (and on this charge the live issues seem to hang) that certain day trains between St. Louis and Memphis, known as 801 and 802, no longer stopped at Caruthersville, but were diverted through a cut-off, to the inconvenience, loss and injury of the business and inhabitants of said city. That said failure to stop there was without meritorious cause, etc. Complainants prayed an order requiring said trains to

run into and stop at Caruthersville as they had formerly done, thereby correcting the alleged wrongs.

It seems the railroad company itself was made a party defendant, together with said receivers, in the original proceedings before the Commission. Accordingly, on the coming in of said complaint, the railroad company filed its separate answer setting up the fact that its co-defendants were acting as receivers under the appointment of the United States District Court for the Eastern Division of the Eastern District of Missouri; and that since their appointment said receivers have had full possession and operative control of its railroad and properties.

By their answer, the receivers denied the charges made in the complaint, admitted they had charge of and were operating the road and its properties and that they had in August, 1913, discontinued the operation of trains 801 and 802 by the way of Cauthersville for the purpose, they allege, of reducing expense and making connections at St. Louis and Memphis, and they further averred that they are furnishing reasonable passenger facilities to Caruthersville.

On issues thus joined a hearing was had before respondent Commission, on testimony taken and duly preserved, with the result that the Commission found in favor of the complainants as to said trains 801 and 802, that the passenger service at Caruthersville was insufficient and inadequate, and an order was passed and served on appellants in effect to run said two passenger trains through Caruthersville and stop them at the depot there to receive and discharge passengers and their baggage, and appellants were given until August 2, 1915 (about six months), to comply with such order. (*Vide* Byrd v. St. Louis & San Francisco Railroad, 2 P. S. C. 430).

Denied a rehearing, appellants in statutory form sued out a writ of *certiorari*, in the Cole Circuit Court. On a new hearing in that court, on the same record before the Commission, it was adjudged that the order of

respondent Commission be affirmed. From that judgment, on due intermediate steps taken, the cause came up on appeal to this court, was heard first in Division and then in Banc with a special judge on the bench in place of Judge FARIS, who declined to sit.

The case was submitted in Banc on the admission that in due time appellants complied with the order and are now running and ever since the time limited in the order have run said trains in compliance therewith.

Recognizing that refusing to stop day trains 801 and 802 at Caruthersville and that by re-routing them through the cut-off, aforesaid, and leaving that city to one side, would seriously affect the convenience of its inhabitants and of the passengers destined to or from that point and the business of the city, appellants attempted to remedy the inconvenience and loss of facilities in ways that will appear later or when a statement of the facts is made and when the reasonableness of the order is up for judgment. So the facts relating to the inconvenience and loss to Caruthersville and its people and the traveling public by the substituted scheme of appellants, abrogated by the order of the Commission under review, will be sufficiently set forth.

On a record thus briefly outlined, learned counsel for appellants argue the judgment of the circuit court, affirming the order of the Commission, should be reversed; because, they say:

First: As to the railway company itself the order was error for that the receivers, not the company, operated the railroad when the complaint was filed.

Second: The court exceeded its power in affirming an order re-routing trains 801 and 802.

Third: The order of the Commission affirmed by the court, was arbitrary, unjust and unreasonable (and herein of the reasonableness and adequacy of he passenger train service existing at the time and of certain constitutional questions sprung).

Fourth: Such order was void for that it interfered with interstate commerce by impinging on named constitutional guaranties in that behalf.
Of these in their order.


I. *Of the alleged error in the inclusion of the St. Louis & San Francisco Railroad Company in the order of the Commission and the judgment affirming the same.*

Appellants assign error for that the railroad company was included in the order when, as here, the road and its properties were in the hands of receivers. The assignment justifies the following observations:

(a) While it is clear from the abstract that the railroad company was ·a party below and was affected by the order and judgment, yet it is far from clear whether the company did or did not appeal jointly with the receivers. There are *indicia* in the record (as well as in briefs) pointing both ways. Now, if it be true that the company did not appeal, then it is also true that the receivers cannot be allowed to stand in its shoes in so far forth as to make such point in the company's behalf; for in an appellate court the fetching and stirring motto of Dumas' Three Guardsmen, "One for all and all for one," is not practically applied in settling the right of one appellant to make a point that concerns another party, who was a co-defendant and did not appeal but abided the judgment. The statutes of the State ordain that error to be reversible must be "error . . . *against the appellant or plaintiff in error.*" [R. S. 1909, sec. 2082.]

(b) But if the assumption be indulged that the company actually appealed from the judgment affirming the order of the Commission, then there are several reasons why the assignment of error is not well laid.

In the first place, before the cause could get into the circuit court for review, it was necessary for parties complaining of the order of the Commission to apply for a rehearing. [Laws 1913, sec. 110, p. 640.] Such application or motion for rehearing, by express statu-

tory command, must specifically set forth the ground or grounds on which the applicant "considers said order to be unlawful, unjust or unreasonable," and prescribes (p. 641) that "no corporation or person or public utility shall in any court urge or rely on any ground not so set forth in said application."

Now, in appellants' application for a rehearing before the Commission, no such ground as that under discussion was set forth. Hence, the point cannot be ruled on its merits, but must be disallowed to appellants by virtue of said statutory command.

In the next place, no such ground of error was laid in appellants' motion for a new trial or their motion in arrest. In that condition of things, an unbending rule of appellate procedure precludes the consideration of any errors not drawn to the attention of the court, *nisi,* in one or the other of these motions. [Maplegreen Co. v. Trust Co., 237 Mo. l. c. 352-53.]

The premises all in mind, the point is disallowed to appellants.

II. *Of appellants' point that the court had no power or jurisdiction to affirm an order requiring the re-routing of trains 801 and 802.*

It will be observed that the word "court" is employed in the point and not the word "Commission." However, in disposing of the contention, we shall assume that appellants' point is tantamount to a total denial of power in the Commission to make the order it did; and since, under the Public Service Act, the circuit court exercises a jurisdiction in its nature derivative or appellate, rather than original, it follows that if the Commission had no power to make the order originally, then the circuit court had none to adjudge an affirmance of the order—this agreeable to the maxim, *Cessante primitive, cessat derivativus*—and so appellants' learned counsel treat the contention in their formidable printed argument which runs on the theory that the Public Service Act donated to the Commission

no power to make trains "deviate from the route dictated by a practical operating policy." In other words, counsel say that this is essentially a case of *re-routing* and that the Commission had not a whit of power to re-route passenger trains in any case that can be put. Now, if the real question here was the naked and bald one or re-routing trains, no more and no less, then, under the challenge made, we would have called to see whether the finger could be put on such general power to be exercised generally. But in the judicial exposition of a statute so remedial, comprehensive, far-reaching and novel as the Missouri Public Service Act, it is wise to allow such exposition to proceed in its evolution step by step as each concrete case in hand calls; and, therefore, under the facts of this record, we are of the opinion that the case ought not to break on the thin edge of so narrow and academic a question as that of merely re-routing two passenger trains operated by the receivers, and this, because:

In the instant case, the order of the Commission was responsive to the complaint, and the gist of the complaint was that it was necessary to have trains 801 and 802 · *stop* at Caruthersville, as they had formerly done, so that said town would have adequate and convenient railroad facilities and service. In our opinion, such re-routing of the two trains as required them to run over the original line around the curve *via* Caruthersville instead of running them through the cut-off was a mere *incident* or *condition* relating to the stoppage of said trains at Caruthersville station, which latter, to-wit, the stoppage of trains, was the very heart and soul of the matter. It results from these views, that to search through the Public Service Act with microscopic eyes, as we are invited to do, to discover whether or not the phrase, "re-route trains" appears written there, *ipsissimis verbis,* is not only sticking in the bark, but is a vain and futile task. It may be conceded, for the purposes of this case, that the very word "re-route" or

the very phrase, "re-rout trains," is not written in the statute; but it also must be conceded that the naked question whether the abstract general power (disconnected from the concept of the stoppage of trains) is given to the Commission to re-route railroad trains generally, is not in this case either. On the other hand, the concrete question whether under the facts of such a record as this, and for the purpose of giving to Caruthersville reasonable railroad service and facilities, the Commission had the power to order trains 801 and 802 stopped at that city and, as an incident or condition precedent to that stop, had the power to require them to run there as they formerly had done on the original railroad line, so that they could stop, as in this case; and that proposition must be liberally ruled on the true spirit and intendment of the statute as read in the light of, and interpreted by, the reasons underlying it, keeping always steadily in mind that the furtherance of the benefits sought by the legislation and the retarding of the mischiefs struck at thereby is the golden rule of statutory construction.

The general canon of construction just announced is, in effect, the very rule prescribed by the law-making power for the construction of the Public Service Act (Laws 1913, sec. 127, p. 648), to-wit:

"The provisions of this act shall be liberally construed with a view to the public welfare, efficient facilities and substantial justice between patrons and public utilities."

The act defines many of its own terms and these definitions illuminate and fix its operative scope and intendment, for instance:

Subdivision 24 of Section 2 reads: "The term, 'transportation of persons,' when used in this act, includes every *service* in connection with or incidental to the safety, comfort or convenience of the person transported, and the receipt, carriage and delivery of such person and his baggage."

Subdivision 26 of Section 2 reads: "The term 'service' when used in this act, is used in its broadest and most inclusive sense and includes not only the use and accommodation afforded consumers or patrons, but also . . . the plant, equipment, apparatus, appliances, property and facilities employed by any corporation, person or public utility in performing any service."

Subdivision 2 of Section 47 of the act reads in part: "Whenever the Commission shall be of the opinion, after a hearing had . . . upon complaint that the . . . service of any common carrier railroad corporation or . . . in respect to transportation of persons or property within this State are . . . unreasonable . . . or inadequate, the Commission shall determine the . . . reasonable . . . adequate and proper . . . service thereafter to be enforced . . . and so fix and prescribe the same by order," etc.

Section 49 of the act prescribes, *inter alia*, as follows: "If, in the judgment of the Commission, additional . . . facilities . . . for use by any common carrier, railroad corporation . . . in or in connection with the transportation of passengers . . . ought reasonably to be provided . . . or changes in any thereof in use ought reasonably to be made . . . in order to promote the security or convenience of the public . . . or in order to secure adequate service or facilities for the transportation of passengers . . . the Commission shall . . . make and serve an order directing such repairs, improvements, changes or additions to be made."

What is the meaning of the word "facilities," as used in the foregoing section and elsewhere in the act? It is pointed out by counsel that it is thus defined by an accredited treatise (19 Cyc. 106-7): "Applied to railroads, it means everything necessary for the convenience of passengers and the safety and prompt transportation of freight. As applied to a ferry franchise,

everything incident to the general, prompt and safe carriage of passengers, boats in good repair, appliances answering the purpose, and readiness and willingness to perform the service incident to the grant."

Section 51 of the act reads in part as follows: "The Commission shall, after a hearing, either on its own motion or after a complaint, have power to make an order directing any such railroad corporation or street railroad corporation to increase the number of its trains or its cars or its motive power or to change the time for starting its trains or cars or to change the time schedule for the run of any train or car *or make any other suitable order that the Commission may determine reasonably necessary to accommodate and transport the traffic, passenger or freight, transported or offered for transportation.*"

Other sections of the act might be profitably invoked to show that the re-routing of a train for the purpose of stopping it, thus affording adequate facilities and service to a county seat on the line, is within its purview; but the foregoing is enough for our purposes. It would be narrow construction of the comprehensive act in question to rule that a public utility could, without adequate cause, take from an important community the reasonable service and facilities it had theretofore received at the hands of such public utility, and, as it were by a mere twist of the wrist, to-wit, the administrative detail or expedient of re-routing a train through a cut-off, thereby disarm the Public Service Commission of all power to correct any resulting inadequate new service by re-establishing the old. Such construction would open an inviting door to drive a coach and six through the statute and we are clearly of the opinion that it would not be within the intendment of the act. It is on such premises we shall rule the point against appellants; and in doing so we shall limit our holding to the precise case in hand, namely:

We hold that the Public Service Commission of Missouri has power and jurisdiction to require the re-

routing of trains where (as here) the re-routing is a mere incident to the main thing, to-wit, the *stoppage* of such trains in order to render reasonably adequate service to a town, especially where such re-routing is but re-establishing the service formerly rendered by the public utility to such town.

This brings us to the main question in the case and calls for the record facts.

III.  *Of the contention that the order of the Commission was arbitrary, unjust and unreasonable (and herein of the reasonableness and adequacy of the train service existing at Caruthersville at the time the order was made, and of certain constitutional questions sprung.)*

St. Louis is 305 miles from Memphis.  As we understand the record, the St. Louis & San Francisco Railroad purchased from other roads certain lines of track running in the region of and *via* Caruthersville, and presently connected these tracks with the terminal cities of St. Louis and Memphis.  When completed, the original line of the St. Louis & San Francisco Railroad ran through Caruthersville in Pemiscot County, *en route* from St. Louis to Memphis.  Northwest of Caruthersville is the station of Hayti.  Southwest of Caruthersville is the station of Grassy Bayou, and trains on the original line, running south from St. Louis, first reached Hayti, next Caruthersville and next Grassy Bayou.

Now, as the bee flies, the distance from Hayti to Grassy Bayou is about six miles, while the distance between the same points by way of Caruthersville on the line of the original railroad is about ten miles (to be exact, 9.9) farther.  In other words, the original line curved to the east and made a detour to pass through Caruthersville.  In 1904, after the original line was built and in operation, the railroad company built a "cut-off" track on said direct line from Hayti to Grassy Bayou and at once began to run its through

heavy freight trains between St. Louis and Memphis by way of this cut-off. At the same time, it also put on two through passenger night trains (one each way) of best modern equipment and service, which said trains were scheduled at 35 miles an hour; and, as we gather, these night trains never ran *via* Caruthersville, but used said cut-off; but to accommodate mails and people of Caruthersville and those passengers to and from Caruthersville who desired to use these night trains, a sleeper to connect with each, ran back and forth from Caruthersville to Hayti on the old original line. No complaint is made of this arrangement, nor was any change sought therein by the complaint. The record also shows that what is known as "through travel" between Memphis · and St. Louis used these night trains to such an extent that on the day trains, presently to be mentioned, the through travel was negligible.

At the same time this cut-off was built, and continuously thereafter for nine years, until August, 1913, the railroad company also operated two daily passenger trains (one each way) between St. Louis and Memphis *via* Caruthersville. These trains were known as Nos. 801 and 802—the one south-bound to Memphis being No. 801, and the one north-bound to St. Louis being No. 802. These day trains were called "through trains," but they were in fact accommodation trains doing a local (intrastate) business and stopping at over 60 stations, flag stations and cross roads, between said terminal cities. They also did an interstate business. They ran at a slow schedule rate of 23 miles an hour— the one running north from Memphis at a bit faster schedule than the one running south from St. Louis, of, say, forty or fifty minutes.

Caruthersville, the county seat of Pemiscot County, is on the Mississippi River and while it has such negligible river shipping and passenger service as was in vogue on that river at that point at the times in hand, yet it quite depended for its mail and passenger

service on said railroad company, which, as we gather, has an unbroken monopoly of the railroad business of that region.

Caruthersville is a flourishing, ambitious city of 5000 people, keenly engaged in business in a rich and rapidly developing country. The railroad company has a twelve-thousand-dollar passenger station there, and, at the times in hand, 7000 tickets were sold to passengers traveling out of Caruthersville each month, at an average monthly cash receipt therefrom of $4000 ($48,000 per year). So railroad receipts from freight business amounted to $18,000 per month, or $216,000 per year. In fact, barring Cape Girardeau, the record shows it is the largest and briskest city and the most remunerative shipping point for passengers and freight anywhere on appellants' railroad between Memphis and St. Louis.

It further appears that under the spur and lure of a promise that it was not to lose or have interfered with its said through day train service then existing, Caruthersville caused to be procured the right of way for the cut-off mentioned and its citizens donated most of the right of way to the railroad company.

The record shows the following additional facts:

Train 802 was the only day train run by appellants north-bound from Memphis by which passengers from Caruthersville could leave that city in the day time, and, without change of cars, reach St. Louis; and train 801 was the only day train south-bound from St. Louis by which passengers from that city (and intermediate points as far south as Cape Girardeau) could reach Caruthersville in the day time without change of cars. So, said two trains were the only day trains by which passengers could reach or leave Caruthersville from the south in the day time at seasonable hours without change of cars. It appears that much of the business of Caruthersville at the times in hand came from territory south of the city, and the accommodation of the people in that region is a material and live matter

to the prosperity of the city. Said two trains were much used during all the years they ran *via* Caruthersville and supplied it with necessary facilities and service. It seems to be abundantly shown that they were a great convenience and benefit to the city as originally run; and there is substantial evidence tending to show an appreciable business loss to the city by the substituted service and substantial inconvenience in delays incident to the change of cars in making connections and in the quality of the service rendered and the facilities afforded by the substituted service. The Commission found (2 P. S. C. R. p. 440) that "the train service as now offered the public at Caruthersville is *branch-line* service both as to equipment . . . and manner of operating trains," and that finding is sustained by the substantial weight of the evidence. There are a dozen or fourteen passenger trains operated to or through Caruthersville in one day. Some of these were in existence when trains Nos. 801 and 802 ran *via* Caruthersville. Some of them were put on after said trains 801 and 802 no longer ran *via* Caruthersville and some of them met trains 801 and 802 at Hayti, so that passengers to and from Caruthersville might take them. The paper showing made in regard to the number of passenger trains in and out of Caruthersville at the time of the hearing before the Commission loses some of its significance by the fact that some of them are shuttle trains and the same train carries a different number each way. The passenger traffic accommodated by most of these trains, is not, in its entirety, the passenger traffic accommodated by trains 801 and 802, but extended to the west and southwest. The Commission, as pointed out, spoke of the service and facilities at Caruthersville as "branch-line." Now, a *branch-line* service in southeast Missouri, as shown by this record (and of which the court may, without serious impropriety, take notice), is an indifferent service put up with, because nothing better is offered. It is not the kind of service and facilities to give satis-

faction, business health and vigor to an ambitious and growing city like Caruthersville. We give an extract from the finding of the Commission, which is sustained by the record, which sufficiently gives the data of the service and facilities afforded to the public at Caruthersville.

"Defendants operate a passenger train (No. 821) daily from Hayti *via* Caruthersville to Memphis, leaving Caruthersville at ten minutes after five o'clock a. m., thence to Turrell, Arkansas, where the cars are placed in another train and carried to Memphis, and cars are carried from Memphis to Turrell, Arkansas, and from that point, as No. 822, are carried to Caruthersville, arriving there at eleven o'clock p. m. When trains Nos. 801 and 802 were diverted from Caruthersville, defendants put into service passenger trains Nos. 825 and 826, which are operated daily from Blytheville, Arkansas, *via* Caruthersville, Hayti and Kennett, to Cape Girardeau and return, arriving at Caruthersville, going north each day at 7:25 a. m., and returning *via* Caruthersville at seven o'clock p. m. Defendants operate passenger trains Nos. 881 and 882, leaving Caruthersville as No. 882 at fifty minutes after five o'clock, thence to Hayti, Kennett and Cape Girardeau by way of the Leachville branch, and returning to Caruthersville as No. 881 at five minutes after nine o'clock p. m. A passenger train is operated as trains Nos. 893-894-895-896-897-898-891-892 between Campbell, Kennett and other points to Hayti and Caruthersville. That train carries all passengers to and from trains Nos. 801 and 802 and between Caruthersville and Hayti. Train No. 802 as now scheduled arrives at Hayti at forty-five minutes after eleven o'clock a. m. Passengers coming from Caruthersville to take that train leave Caruthersville at fifteen minutes after eleven o'clock a. m., and that train is due at Hayti at forty minutes after eleven o'clock and is due to arrive at Caruthersville from Hayti at twenty minutes after twelve o'clock. Train No. 801 is due to arrive at Hayti at five minutes

after four o'clock p. m. The train to meet this train at Hayti leaves Caruthersville at thirty minutes after three p. m. and arrives at Hayti at fifty-five minutes after three o'clock p. m. and returns to Caruthersville at forty minutes after four o'clock p. m. As trains Nos. 801 and 802 are now operated, all passengers going to and from Caruthersville are required to change to or from the said main line at Hayti."

It will be observed that appellants' answer undertook to justify running trains 801 and 802 through the cut-off, rather than *via* Caruthersville, in order to reduce expenses and make connections at St. Louis and Memphis. Without cumbering the opinion with further details, we state that we do not find these averments of the answer satisfactorily supported by the evidence. To the contrary, at the hearing, other reasons were given for the re-routing of trains, for instance, some relating to track conditions; but we do not find that improper track conditions may not, and should not, with business propriety and reasonable outlay, be overcome; *and throughout the whole case, the pregnant fact runs like a marking thread that for nine years after the cut-off was built and in use, the railroad company itself acted on the theory that the routing of these trains via Caruthersville was a practical railroad proposition, all of which must be held to evidence the fact that the railroad company on its then settled judgment deemed such running of said trains a necessary convenience of service and facility to that city and to local traffic wants.*

It appears that the greater percentage of the income of the passenger traffic on these trains, in and out of Caruthersville, was from an intrastate, rather than an interstate, service, was largely a local as contradistinguished from a through business.

Charges are made on one side that the routing of trains 801 and 802 through the cut-off originated in hostility to the growth and development of Caruthersville and in a corporate disposition to build up a rival

city in Hayti. But we do not find the record sustains that contention nor do we find anything in the record to sustain the contention, made on the other side, as we gather, that the re-establishment of the former routing of trains 801 and 802 originated with complainants as a plan to injure Hayti.

On such record, on the assignment of error now under consideration, we announce the following conclusions:

(a) That the order of the Commission, affirmed by the Circuit Court and appealed from, was neither arbitrary, oppressive, unjust nor unreasonable on the record we are dealing with.

(b) That at the time the order was made, the north and south passenger train service at Caruthersville was, in fact, inadequate and unreasonable.

(c) In reaching the above conclusion, we have held in review (among other things) the condition of the track in the detour, the expense incident to its reasonable repair, the fact that the railroad is under a Federal Receivership, the number of passenger trains in and out of Caruthersville daily and the alleged interference with connections at terminals, which, we think, encompass the main contention of appellants under this head; and in this connection, we make the following observations on two phases of the case:

(1) It must, in reason be allowed that the mere *number* of trains is not of so much importance, on the question of reasonableness and adequacy of service, as are the *direction, destination* and facilities of the trains listed. The fact that some of these trains are "shuttle trains," and that many of the others bear away southwest from the main line and across the Little River drainage territory, must not be overlooked, for the inadequacy complained of is in the north and south service.

(2) There was testimony tending to show that to make the old track around the detour as good as the main-line track, would cost, it was estimated, $6000 per

mile; but it does not appear that for these slow-moving day passenger trains, 801 and 802, a track was required as good as the main line, nor does it appear that the condition of track, ties and road bed around the detour was not, at least, to some extent, due to neglect which ought to cease. We are of the opinion the track outlay, if any be necessary, would not be unreasonable, nor are terminal connections unreasonably interfered with—a subject referred to again later

(c)  In this connection it is argued by learned counsel for appellants that the order of the Commission, in question, was unconstitutional and void for that it denied the railroad company the equal protection of the law and did not constitute due process of law. As to that, we say:

The contentions take not only color but hinge on the related question of fact, namely, whether the order is reasonable or unreasonable, arbitrary or not, just or unjust, oppressive or not.  We have been cited to no soundly-reasoned and controlling case, holding that the reasonable and just order of a public service commission, requiring adequate and reasonable train service and transportation facilities, at a given town on its line, impinged upon the constitutional guaranties of due process and equal protection of the law, where, as here, the orders of such Commission are made subject to judicial review by the act creating it and donating regulation power to it.  In this view of it, since the fact of the justness and reasonableness of the order in question has already been determined in this opinion, and since appellants are now having their day in court and a judicial hearing, we disallow the constitutional points under discussion and hold them without controlling vitality on this record.

This brings us to the only remaining material contention of appellants', namely:

IV.  *Of the contention that the order was void for that it interfered with interstate commerce by impinging upon named constitutional guaranties in that behalf.*

In ruling the contention, the following propositions must be taken as true, to-wit:

*First.* There are no Federal regulations shown by this record covering the subject-matter of the concrete case. Hence, it cannot be held that the authorities of this State, in making the order in question, have intruded upon territory already occupied and covered by Federal regulations in point.

*Second.* It must be considered that the order in question, on its face, does not relate to or cover interstate commerce, but, on the other hand solely on its face relates to and is levelled at local and intrastate transportation service and facilities at Caruthersville for passengers. Hence it cannot be ruled that the order on its face is void as an interference with interstate commerce.

*Third.* It is self-evident that if the order complained of affects interstate commerce at all, it does not do so directly, or as the gist of the matter, but only indirectly and incidentally.

*Fourth.* Present the three propositions just ruled above, it results that the remaining and decisive inquiry is this:

Does the order, under the cover and guise of a regulation of an intrastate matter, nevertheless lay an unreasonable burden upon and is it unduly restrictive of interstate commerce? For it may be conceded that the right doctrine is that a State regulation surcharged with vice of that character, may be drawn within the intendment of the commerce clause of the Federal Constitution and may become void under such circumstances.

Now, we search in vain in this record for any unreasonable burden or for any undue restrictions upon interstate commerce hid away in the bowels of the order. The through passenger travel on the railroad between its terminals, St. Louis and Memphis (except to a negligible extent), is taken care of on its two heavy and modern night trains, which latter run and

always have run through the "cut-off." The only two through passenger day trains, to-wit, 801 and 802, which are affected by the order, carry few or no through passengers from St. Louis to Memphis or *vice versa.* The connections at St. Louis and Memphis for those who do use these day trains are not seriously hurt by the order. So, too, these day trains in question, though well equipped, run on an exceedingly slow schedule, calling for sixty stops at this or that cross-road, way station and little town, in running about three hundred miles. Now keeping in mind that Caruthersville is a fine, growing and populous city (as cities run in Missouri), is a county seat and originates more passenger business and travel, in and out, than any other city on the entire line, outside of St. Louis and Memphis, and excepting only Cape Girardeau—we say, keeping in mind these facts and the further fact that Caruthersville, by the use of the "cut-off" by these two day trains, was to all intents and purposes, relegated to "a branch-line service," with all its incident disadvantages and impediments to travel, he would be an over-bold man who would not conclude that interstate commerce would be benefitted rather than burdened or restricted by the order appealed from.

We are of the opinion, then, that interstate commerce will be benefitted by the order and will not be unduly restricted or burdened by it. We therefore conclude that the order is not subject to be attacked from the angle that it unduly restricts or burdens interstate commerce.

The conclusions reached under this head, are well within the doctrines announced in a line of cases. We cite only a few: Gulf Colorado & Santa Fe Railway Co. v. State of Texas, 246 U. S. 58, 38 S. C. Rep., 236; Chicago, B. & Q. Ry. Co. v. Railroad Com., 237 U. S. 220; Lake Shore & M. S. Railroad v. Ohio, 173 U. S. 285; State ex rel. Mo. Pac. Ry. Co. v. Atkinson, 192 S. W. 86;

State ex rel. Mo. Pac. Railroad v. Public Service Commission, 273 Mo. 632.

The premises all considered, the order of the Commission, appealed from, should be affirmed. It is so ordered.

All concur, except *Woodson, J.,* who dissents in separate opinion, in which *Bond, C. J.,* joins; *Faris, J.,* not sitting.

WOODSON, J. (dissenting.)—I dissent from the opinion written in this case by our learned special judge who was called in to sit with us in the case, because of an equally divided court, one of our number not sitting.

For the reasons stated in the opinion I wrote when this case was in Division, which I refile here as a dissent, I dissent from the majority opinion herein.

I also dissent for the further reason that the majority does not state the facts as I understand the record discloses them. The facts stated by me in the divisional opinion, which is refiled here, were taken almost literally from the statement of the case made by counsel for the respondent, and in my opinion the record sustains that statement.

The divisional opinion was as follows:

"This action originated before the Public Service Commission, by the mayor and board of aldermen of the City of Caruthersville, filing a petition requesting an order requiring the appellants to re-route their trains, Nos. 801 and 802, through said city.

"After hearing the evidence, the respondent ordered the appellants to route said trains through Caruthersville as prayed. From that order the appellants moved the case to the Circuit Court of Cole County by writ of *certiorari.* After hearing the case the circuit court affirmed the order of the Public Service Commission, and in due time appellants appealed the cause to this court.

"The principal facts of the case are stated by counsel for respondent in substantially the following language:

"That Caruthersville is the county seat of Pemiscot County and has about five thousand inhabitants. The appellants, at the time of the filing of the original complaint herein, were erecting a new passenger depot at Caruthersville at a cost of $12,000. The railroad facilities furnished at that place before the construction of the line from St. Louis to Memphis by the St. Louis & San Francisco Railroad Company were afforded by a line of railroad extending through Caruthersville to a point in Arkansas. This line was extended north to St. Louis and south to Memphis, Tennessee, and was acquired by the St. Louis & San Francisco Railroad Company. About the year 1904, the entire railroad from St. Louis to Memphis was completed and opened for use. The line of appellants' railroad extending through Caruthersville makes a large curve toward the east. The distance in a direct line between Grassy Bayou, which is on the railroad south of Caruthersville, is six miles, while the distance along the railroad from Grassy Bayou to Caruthersville is nine miles, and from there to Hayti is seven miles. In 1904 the appellant railroad company constructed a railroad track from Grassy Bayou to Hayti, almost due north and south, a distance of six miles, connecting the north and south line of appellants' road, instead of detouring to the east nine miles from Hayti to Caruthersville, and then back seven miles to Grassy Bayou, thus saving a run of about eleven miles in distance and from thirty-five to forty minutes in time.

"The purpose of constructing the road between the points last named was, as the respondent's evidence tended to show, for the use of the freight trains, and upon this assurance the citizens of Caruthersville assisted in procuring the right of way for the railroad

277 Mo.—19

between Grassy Bayou and Hayti, and donated a large part of it to the railroad company.

"Trains Nos. 801 and 802 were, until August, 1913, routed from St. Louis to Memphis and return through Caruthersville. At the time last named, said trains were routed over the short line from Grassy Bayou to Hayti and Caruthersville to carry passengers to and from said trains Nos. 801 and 802 at Hayti, and passenger trains Nos. 825 and 826 have been put into service between Blytheville, Arkansas, and Cape Girardeau, Missouri, by way of Caruthersville, Hayti and Kennett.

"Caruthersville is the second city in importance on appellants' line between St. Louis and Memphis, and the ticket sales at Caruthersville are only exceeded by the sales at Cape Girardeau. More than seven thousand tickets were sold to passengers traveling out of Caruthersville each month. The receipts from such sales averaged about $4000, and the receipts at said station from freight business amounted to $18,000 per month. Caruthersville is situated on the line of railroad as originally located. Trains Nos. 801 and 802 were operated through Caruthersville for nine years.

"There are, independent of these trains, Nos. 801 and 802, seven trains running daily, each way, from Hayti to Grassy Bayou via Caruthersville, fourteen in all, connecting with the trains on the main line running from St. Louis, Missouri, to Memphis, Tennessee.

"I. Counsel for respondent base their authority for making the order complained of by counsel for appellants, on Sections 49 and 51 of the Act of 1913. (Laws 1913, pp. 588 and 589). They read as follows:

" 'Sec. 49. *Power of Commision to Order Repairs or Changes.* If in the judgment of the Commission additional tracks, switches, terminals or terminal facilities, stations, motive power, or any other property, construction, apparatus, equipment, facilities or device for use by any common carrier, railroad corporation or street railroad corporation in or in connection

with the transportation of passengers or property ought reasonably to be provided, or any repairs or improvements to or changes in any thereof in use ought reasonably to be made, or any additions or changes in construction should reasonably be made thereto in order to promote the security or convenience of the public or employees, or in order to secure adequate service or facilities for the transportation of passengers or property, the Commission shall, after a hearing, either on its own motion or after complaint, make and serve an order directing such repairs, improvements, changes or additions to be made within a reasonable time and in a manner to be specified therein, and every common carrier, railroad corporation and street railroad corporation is hereby required and directed to make all repairs, improvements, changes and additions required of it by any order of the Commission served upon it.    If any repairs, improvements, changes or additions which the Commission has determined to order require joint action by two or more of said corporations, the Commission shall, before entry and service of order, notify the said corporations that such repairs, improvements, changes or additions will be required, and that the same shall be made at their joint cost, and thereupon the said corporations shall have thirty days or such longer time as the Commission may grant within which to agree upon the part or division of cost of such repairs, improvements, changes or additions which each shall bear.    If at the expiration of such time such corporations shall fail to file with the Commission a statement that an agreement has been made for a division or apportionment of such repairs, improvements, changes or additions, the Commission shall have authority, after further hearing, to fix in its order the portion of such cost or expense to be borne by each corporation and the manner in which the same shall be paid and secured.

" 'Sec. 51. *Power of Commission to Order Changes in Time Schedules, Running of Additional Cars and*

*Trains.* If, in the judgment of the Commission, any railroad corporation or street railroad corporation does not run trains enough or cars enough or possess or operate motive power enough, reasonably to accommodate the traffic, passenger and freight, transported by or offered for transportation to it, or does not run its trains or cars with sufficient frequency or at reasonable or proper time having regard to safety, or does not run any train or trains, car or cars, upon a reasonable time schedule for the run, the Commission shall, after a hearing, either on its own motion. or after complant, have power to make an order directing any such railroad corporation or street railroad corporation to increase the number of its trains or of its cars or its motive power or to change the time for starting its trains or cars or to change the time schedule for the run of any train or car or make any other suitable order the Commission may determine reasonably necessary to accommodate and transport the traffic, passenger or freight, transported or offered for transportation.''

"Counsel for appellants deny that either of the sections quoted empower the Commission to make the order complained of.

"In our opinion counsel for appellants is correct.

"By reading Section 49, it will be seen that it relates only to repairs or changes in facilities, and empowers the Commission to require additional tracks, motive power, etc., to be provided, repaired or changed. And, as well said by counsel, 'it does not authorize the Commission to direct where trains shall be run, but attempts to regulate only the facilities by which trains are run;' and especially may we add, that neither of said sections empowers the Commission to order what particular train or trains shall or shall not run to or from particular places. Such orders would be unjust, unreasonable. oppressive and intolerable,

and doubtless that is why the Legislature withheld that power from the Commission.

"All the Legislature had in mind was to empower the Commission to require the railroads of this State to furnish ample and suitable trains to (accommodate) the public demand, where they were refusing or neglecting to so do. If the fourteen trains before mentioned are not sufficient and suitable for the transportation of freight and passengers to and from Caruthersville, at reasonable times, then clearly the Commission has the authority, under said statutes, to require appellants, to furnish them.

"Moreover, trains Nos. 801 and 802 are interstate trains, engaged in interstate commerce, and for that reason, the State has no power or authority to impose unjust, unreasonable or oppressive burdens upon them. The following cases so hold: Illinois Central Ry. v. Illinois, 163 U. S. 142; McNeil v. Southern Ry., 202 U. S. 543; Atlantic Coast Line v. Wharton, 207 U. S. 328; Herndon v. C., R. I. & P. Ry., 218 U. S. 135; Kansas City Southern Ry. v. Kaw Valley District, 233 U. S. 75; C. B. & Q. Ry. v. Wisconsin Railroad Com., 237 U. S. 220.

"There has been so much, and so well said, upon this subject, by the United States Supreme Court, that nothing of additional importance can be said by this court.

"The mere statement of the facts of this case conclusively show that the order in question requiring these interstate trains to detour seventeen miles out of their due course simply in order to furnish Caruthersville with two additional trains, when she already has fourteen, is unjust, unreasonable and oppressive, within the meaning of the authorities cited.

"If the fourteen trains mentioned are not ample or suitable for the purposes mentioned, then the Commission has the authority, under the statutes mentioned, to remedy those deficiences, but not to impose this unjust burden on those through trains.

"There are other points presented and discussed by counsel, but the view we have taken of the case renders it unnecessary for us to notice them."

For the reason stated, I dissent.

BOND, C. J., concurs herein.