**268** PEOPLE EX REL. ADIRONDACK P. & L. CORP. *v.* P. S. COMM.

Third Department, March, 1922. [Vol. 200

THE PEOPLE OF THE STATE OF NEW YORK ex rel. ADIRONDACK POWER AND LIGHT CORPORATION, Relator, *v.* PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK, CITY OF SCHENECTADY and VILLAGE OF SCOTIA, Respondents.

Third Department, March 8, 1922.

Gas and electricity — certiorari to review proceedings of Public Service Commission fixing rates for gas — burden of showing that rates fixed are unfair is on relator — rules for determination of fair value of property — present cost of reproduction less depreciation not controlling — actual investment as shown by books generally safe rule to follow in fixing fair value of plant — no evidence of appreciation — Commission justified in accepting books as evidence of fair value — depreciation reserve deductible from assets in fixing value — rule not changed by investment of depreciation reserve in additions to plant — item entered on books on reorganization to offset value of securities issued by old corporation not part of assets — receivership expenses on reorganization considered as assets — going concern value allowable as assets — no allowance can be made for estimated expenses which books do not show were incurred — allowance for working capital at value of materials and supplies on hand plus one-eighth of yearly operating expenses proper — calculation of expenses at less than present high cost not improper since order fixing rates was limited to six months — quære whether eight per cent is sufficient return.

On certiorari to review the proceedings of the Public Service Commission in fixing the rates which a public service corporation may charge for gas, the court will review both the facts and the law, and on such review the findings of fact made by the Commission are presumed to be right and the rates fixed are *prima facie* fair and valid; the burden of showing them unfair or inadequate rests on the relator.

In determining the fair value of the plant for the purpose of fixing the price for gas there is no single, fixed basis or rule which may be followed in all cases to the exclusion of all other considerations. The Commission may consider all the facts which in its judgment have a bearing with due regard to a " reasonable average return upon capital actually expended," above all necessary operating expenses and " to the necessity of making reservations out of income for surplus and contingencies;" and, where there has been actual appreciation in the value of property acquired by capital actually expended, the corporation is entitled to have that appreciation included in calculating the fair present value.

The present cost of reproduction less depreciation is not a necessary or controlling element in fixing the fair present value of the plant, and the Commission was right in refusing to be controlled thereby in the present case.

Except where there has been an actual, considerable and more than temporary increase in values and in costs, the actual investment shown upon the books of the corporation, fully, fairly and honestly kept, is a more certain and more true guide to that " reasonable average return upon capital actually expended " which the statute contemplates, than is the fluctuating uncertainty which attends upon the attempt to apply the present reproduction cost, less depreciation, as the sole or controlling element in determining the fair present value.

There is no evidence in the record which the Commission was bound to accept showing that there had been an actual, considerable appreciation above the capital expended in the value of the plant of the relator.

The determination as to the fair present value of the plant of a public service corporation must in each case depend upon the special facts, and in this case the

Commission was justified in accepting the books of the relator as better proof of the capital actually expended and the present fair value of the property than the estimates made by witnesses for the relator.

A depreciation reserve carried on the books of the corporation must be deducted from the assets of the company for the purpose of determining the fair present value on which to base rates, and this rule is not changed by the fact that the money reserved against depreciation has been actually expended in the construction of additions or extensions to the plant.

The item which the relator, on the reorganization of an old corporation whose assets the relator acquired, charged to the account of franchise, etc., which was entered to offset the par value of securities issued by the old corporation, and which did not represent an investment of any moneys at the time of the reorganization, was properly deducted from the assets of the relator. But it was proper for the Commission to allow as a part of the assets the receivership expenses paid on the reorganization.

The allowance made by the Commission to cover the going concern value of the relator, which was determined by deducting certain intangible items from the book value and allowing twelve per cent of the value of the tangible property shown on the books, was proper, and the Commission was justified in failing to recognize or follow the testimony on the part of the witnesses for the relator of estimates covering organization expense, engineering and other items which did not appear on the books of the relator to have been incurred or paid.

The allowance by the Commission of working capital represented by the value of materials and supplies on hand, plus one-eighth of the operating expenses of the relator for one year, less taxes and uncollectible bills, was proper, though it would not have been wrong if the Commission had made an allowance of one-sixth of the expenses instead of one-eighth.

The failure of the Commission, in calculating the operating expenses, to recognize the unusually high cost of materials, coal, oil, freight and labor and to recognize that increased consumption of gas was due to unusual causes of a temporary nature, was not error, since the order fixing the rates was limited to a period of six months, which has expired, and if the rates thus fixed have actually furnished a return less than fair the Commission may immediately correct the mistake in such manner as to make good any losses suffered.

At the present time, when interest rates are much higher than they formerly were, it is doubtful whether an eight per cent return is sufficient, but it cannot be said from the evidence in the case that the allowance made by the Commission is too small, and if actual experience demonstrates that the return is too small, application may be made to the Commission for a modification and then the actual experience of the company can be shown.

CERTIORARI issued out of the Supreme Court and attested on the 23d day of April, 1921, directed to the Public Service Commission of the State of New York, Second District, commanding it to certify and return to the office of the clerk of the county of Albany all and singular its proceedings had in requiring the relator to amend its schedules of rates for gas and to file new schedules, and denying a rehearing.

A company, with a small capital, was supplying artificial gas in the city of Schenectday for many years prior to 1894. There was an outstanding mortgage upon its plant of $100,000. The company failed and its property was sold by the receiver for the sum of $25,000. There was a reorganization under the name of the Schenectady Illuminating Company, which continued furnishing

**270** People ex rel. Adirondack P. & L. Corp. *v.* P. S. Comm.

Third Department, March, 1922.                    [Vol. 200

gas until May, 1919, when it was merged with the Mohawk-Edison Company. In August, 1920, there was a further merger and the business was continued under the present Adirondack Power and Light Corporation.

On June 11, 1920, the relator fixed and filed rates for the use of gas for light, fuel and power in the city of Schenectady, the village of Scotia and other places within its district. The city of Schenectady and the village of Scotia complained to the Commission that the rates so fixed and filed were unjust, unreasonable and excessive. The relator answered this complaint. After a trial of the issues raised, the Commission fixed the prices for gas that should be charged for six months and thereafter until other order was made and requiring the relator to amend its schedules accordingly. The prices so fixed were smaller by twenty-five cents per 1,000 feet of gas than those filed by the relator. The relator then asked for a rehearing, which was denied.

*Naylon, Robinson & Maynard* [*Daniel J. Kenefick* and *C. Pascal Franchot* of counsel], for the relator.

*George B. Smith,* for the respondent the City of Schenectady.

*John P. O'Brien, Corporation Counsel* (*James A. Donnelly* and *Judson Hyatt* of counsel), for the City of New York, *amicus curiæ.*

Van Kirk, J.:

The relator complains of several errors made by the Public Service Commission.

The principal complaint is that the Commission disregarded some rules of law that have been applied by the courts to cases of this character.

The court is to review both the facts and the law. On such review, the findings of fact made by the Commission are presumed to be right and the rates fixed are *prima facie* fair and valid; the burden of showing them unfair or inadequate rests on the relator. (*Louisiana R. R. Comm.* v. *Cumberland Tel. Co.,* 212 U. S. 421, 423; Pub. Serv. Comm. Law, § 72, as amd. by Laws of 1920, chap. 542, and Laws of 1921, chap. 134.)* The relator is a public service corporation. We must seek to ascertain the fair value of its property which it is using for the convenience of the public. (*Smyth* v. *Ames,* 169 U. S. 466.) Stockholders of such a corporation retain their holdings and others invest in its stock for the return they feel confident of getting. Such return should be comparable with the return from other investments. In such public service

---

* By Laws of 1921, chap. 134, the short title of statute was changed to Public Service Commission Law.— [Rep.

corporations there is not in full the speculative element such as exists in many business enterprises. The corporation affairs and its earnings are regulated. There is no general competition. The income is surer of realization to the extent permitted. The chances of loss are less. Unexpected profits are not usual and melons are not cut. The return permitted should be fair to the investor and fair to the public served.

The first complaint is that, in fixing the " fair value of relator's property " the Commission acted arbitrarily and disregarded entirely the reproduction cost new, less depreciation. In determining this fair value, in order to fix the price for gas, there is no single, fixed basis or rule, which may be followed in all cases to the exclusion of all other considerations. In determining the price for gas the Commission may consider all the facts which in its judgment have a bearing, with due regard to a " reasonable average return upon capital actually expended," above all necessary operating expenses and " to the necessity of making reservations out of income for surplus and contingencies " (Pub. Serv. Comm. Law, § 72); and, where there has been actual appreciation in the value of property acquired by the capital actually expended, the corporation is entitled to have that appreciation, the so-called unearned increment, included in calculating the fair present value. (*People ex rel. Iroquois Nat. Gas Co.* v. *Pub. Serv. Comm.*, 194 App. Div. 578.) But we must bear in mind the distinction between this " appreciation " in value and that added value of the property made by extensions and permanent improvements. Extensions and permanent improvements do add to the value of the property, but that added value is not " appreciation."

The statement in the opinion written for the Commission (*Complaint against Adirondack P. & L. Corp.*, 26 State Dept. Rep. 4), " The present day value of the plant will be held not to exceed its original cost without depreciation, except as to land values," has perhaps given a wrong impression to the counsel for the relator. We do not understand this to be a rule of law which the Commission had concluded to follow in all cases regardless of the evidence, but only its conclusion upon the evidence in this case. The Commission did not mean that it would in no respect or case regard the cost of reproduction, but that it was not a necessary or controlling element and in this case could not control them in determining the value. In this position they are upheld by the weight of authority. (*People ex rel. Kings County L. Co.* v. *Willcox*, 210 N. Y. 479, 495; Pub. Serv. Comm. Law, § 72; *Smyth* v. *Ames*, 169 U. S. 466; *Minnesota Rate Cases*, 230 id. 352.) There are strong reasons why in some cases (if for instance the book accounts are unsatisfactory) the replace-

**272** People ex rel. Adirondack P. & L. Corp. *v.* P. S. Comm.

Third Department, March, 1922.                    [Vol. 200

ment value, less depreciation, should be considered; and in some opinions language is used which indicates that it should be the controlling element, as in *Consolidated Gas Co. of N. Y.* v. *Newton* (267 Fed. Rep. 231); but in that case Judge Hand says: " It may in fact be the case, usually it is, that the safest basis for estimate is the evidence of what the actual plant cost, with its additions, which are not renewals, or a cover for renewals." In applying the replacement cost rule we find serious stumbling blocks in the way. The fixing of the replacement cost means the fixing of the cost of new construction (including cost of materials, labor, superintendence, engineering) at the existing prices. It is permeated with estimates. The corporation has not in fact a new construction; it has an old one. The determination of what deduction should be made from the estimated cost of new production in order to place the supposed newly-produced property on an equality of position with an existing property, more or less worn out as it is, requires further estimate. The method is filled with uncertainty and the Legislature did not contemplate that there should be constant fluctuations in rates based upon the constant fluctuations in costs. It did not contemplate that, during a period of high prices, the company should struggle for increased rates and during the succeeding period of low prices the public should in turn struggle for low rates. The statute intends an average rate. Except where there has been an actual, considerable and more than temporary increase in values and in costs, the actual investment shown upon the books of the corporation, fully, fairly and honestly kept, is a more certain and more true guide to that " reasonable average return upon capital actually expended " which the statute contemplated, than is the fluctuating uncertainty which attends upon the attempt to apply the reproduction cost, less depreciation, as the sole or the controlling element in determining fair value. The years 1919 and 1920 were a period of abnormally high prices, as the result of war conditions; high prices not only of new construction, but also in the expense of operations in producing gas. We do not find in the record evidence, which the Commission was bound to accept, showing that there had been an actual, considerable appreciation, above the capital expended, in value of the plant of the relator. There is no dispute as to the valuations of the real estate. The relator produced Mr. Cheney, who testified that he made a careful inventory of all of the property of the corporation (including of course its tanks, holders, meters, pipe lines with their lengths) and thereafter inspected such property as was visible and placed values thereon, *first,* as to what he considered to be their cost at the time they were put in; *second,* what the cost

would be for new construction, with present prices for materials and labor. In fixing what he considered was actual cost at the time the property was constructed, he had varied largely from the actual cost entered in the books of the company at the time; and in addition he has discovered and included many thousands of dollars of expenses not entered upon the books, or entered at much smaller amounts, for instance, engineering and superintendence, $72,000 (on the books, $7,380.54); law expenditures during construction, $9,000 (on the books, nothing); injuries during construction, $18,000 (on the books, nothing); taxes during construction, $9,800 (on the books, nothing); miscellaneous construction expenditures, $89,000 (on the books, nothing); interest during construction, $61,944.57 (on the books, $14,097). In reference to these last-mentioned items, he says these " are my best estimate " of what such items ought to be. He did not look on the books for these items; was quite sure he would not find enough in the books to cover the items. With such items included the original cost estimate aggregated $2,133,616.98, while the books placed the value much smaller. He fixed the replacement cost, the present cost, as $4,994,154.84; and depreciation from present cost only $563,153, leaving the present value of the plant, less depreciation, $4,431,000. The reproduced plant would probably cost twice as much as the existing plant, although the existing plant is entirely adequate to the service required; and, as stated by Prof. Bemis, the reproduced plant would probably be much more efficient, less expensive to operate, and that the saving in operating expenses would largely account for or offset the extra cost. The determination as to fair value in each case must depend upon its special facts (*Minnesota Rate Cases*, 230 U. S. 352; *Smyth* v. *Ames*, 169 id. 466); and we think the Commission was justified in accepting the books as much better proof of the capital actually expended and the present fair value of the property than the estimates and discoveries made by Mr. Cheney. The Commission has found that the books are properly kept and contain a full and fair statement of the condition of the company and its property. Its opinion shows that it did not overlook the evidence offered by the relator as to replacement value, but it evidently realized that the estimated costs were given in a time which was apparently one of abnormally high prices.

The relator also complains that the Commission has deducted the depreciation reserve item, amounting to $323,455.89. The depreciation reserve is an account kept upon the books to offset the depreciation in the property due to time and use. It is a proper

18

**274** PEOPLE EX REL. ADIRONDACK P. & L. CORP. *v.* P. S. COMM.

Third Department, March, 1922.     [Vol. 200

item in bookkeeping; for property invariably depreciates. This depreciation reserve is taken out of the earnings of the company yearly and, for this corporation, had been authorized at fixed percentages by the Public Service Commission. Presumably the amount reserved was fair and necessary. For illustration, a machine is purchased by the company for $100,000; it is estimated that there is a yearly depreciation in the value of this machine of ten per cent. This machine is carried on the books of the company as an investment of $100,000. At the beginning of the second year it is still carried as an investment of $100,000, but there is entered in the depreciation reserve account a charge against it of $10,000, ten per cent. On the ninth year the actual investment in the machine was but $10,000, although it was carried on the books at $100,000; very plainly the corresponding $90,000 item then in the depreciation account must be deducted from the $100,000 item in the asset account to determine the present fair value of the machine. At the end of ten years the machine, then assumed to be worn out, is still carried as an investment of $100,000, but there is charged against it in the depreciation account $100,000. From earnings the company's books would show that the company had saved $100,000 to replace the machine which it had been carrying constantly at $100,000. If a new substitute machine be then purchased for $100,000, the investment account would still carry the machine at $100,000, but this item of the depreciation reserve would be taken out and there would be no depreciation item against the cost of the new machine. It seems to us very obvious that the depreciation reserve must be deducted from the assets of the company for the purpose of determining the fair value on which to base rates. But the relator urges that, although this depreciation reserve shows over $300,000, in fact this money has actually been invested in extensions and betterments, not going repairs or replacement; so that the company has actually invested this amount of money. But, if so, it was not fresh capital invested by the stockholders, or the corporation; it was money which indeed belonged to the corporation, but which had been collected from the users of gas, and, if not necessary for replacement, the rates during the period in which it was accumulated were larger than fair; it should not be used as a basis for increased rates. The books of the company were before the Commission; their attention was called to the items and they have taken the account as shown by the books and have concluded that the amount in the depreciation reserve account should be deducted from the assets of the company. These extensions and betterments, paid for out of the depreciation reserve, have been made from time to time and have

been like the other property subject to depreciation. As a matter of bookkeeping this finding seems to us plainly correct, and the relator has failed to show that, as a matter of fact, the value of its property has appreciated to the amount of the depreciation reserve account. (*Louisiana R. R. Comm.* v. *Cumberland Tel. Co.,* 212 U. S. 414, 424.)

Complaint is further made that the Commission has deducted from the book assets an item of $305,029.15. This item first appears on the books in the following form: " The plant of the gas company is known to have cost a large sum but at the present time its value is thought to be $75,000. First mortgage bonds, $50,000. Consolidated mortgage bonds, $25,000. Which leaves an amount of $317,500 to be charged to account of franchise, etc."

The property had been purchased at a receiver's sale for $25,000, but the corporation evidently estimated the value of its tangible property at $75,000. The $317,500 was entered to offset the par value of the securities issued. It did not represent an investment of any moneys, and there is no charge at the time of the reorganization entered upon the books excepting the sum of $37,500, the costs of the receivership. It is stated in the opinion that this item has at an earlier time been before the Commission and passed upon by it. At that time it seems the Commission recommended that this item should be gradually taken from the books. The item, $317,500, was later reduced to the figure $305,029.15. The Commission, properly we think, refused to allow this item as a basis for rates, except to the amount of the receiver's expenses, $37,500, but disposed of the question of intangible assets under another head.

The relator claims that it should be allowed in the rate base an item for going value, to the extent of $500,000. In *People ex rel. Kings County L. Co.* v. *Willcox* (210 N. Y. 479) the Court of Appeals has defined " going value " for rate purposes to be the amount equal to the deficiency of net earnings below a fair return on the actual investment due solely to the time and expenditures reasonably necessary and proper to the development of the business and property to its present stage, and not comprised in the valuation of the physical property. It is an allowance for losses during the lean years while business is being developed and the corporation was not receiving a fair return; and, where such fair return was not received, an item for " going value " should be separately allowed. The court says, however (p. 488): " If there was a fair return from the start, the corporation has received all it was entitled to " in this respect. The relator, taking the figures of its accountant, Mr. Cheney, and including the depreciation reserve

**276** People ex rel. Adirondack P. & L. Corp. *v.* P. S. Comm.

Third Department, March, 1922. [Vol. 200

and the $305,000 item above discussed, has offered a schedule showing that the corporation has received less than an eight per cent return, and that the deficiency justifies the allowance of an item for going value of $500,000. Mr. Bemis testifies that, taking the value of the property as shown on the books, after deducting the $305,000 item and the depreciation reserve, the operating income of this company for the entire period was seven and seventy-eight one-hundredths per cent. The evidence does not establish that there was any deficiency of net earnings below a fair return during the earlier life of the corporation. The Commission has held, however, that a property of this kind has a "going value" or a "going concern value" beyond that of its tangible assets and it states that it has in recent cases adopted a rule allowing twelve per cent of the tangible assets for intangible assets or going value. There were certain intangible items set up in the books amounting to $22,216.70. Deducting this amount from the book value and taking the twelve per cent of the tangible value of property shown on the books, the allowance is made of $226,123.29. The relator insists that this is too small an allowance; that there does not appear upon the books items to cover organization expense, interest during construction, engineering and superintendence and all other related physical expenditures during the life of the corporation. Mr. Cheney has testified to very large sums covering these various elements of expense which he says ought to have been incurred. But the real difficulty is they were not. The relator states that the General Electric Company furnished much service without charge. Even if this be so, how can an item in the form of going value be allowed therefor? This company expended no capital for the service and no deficiency was occasioned thereby. We think the Commission was entirely justified in failing to recognize and follow this testimony of Mr. Cheney. If such expenses were incurred by the company, beyond those items for intangibles which appear upon the books, they must have been very much smaller than described by Mr. Cheney and paid for as operating expenses, or they were never incurred. It is more probable that no such considerable expenses were ever incurred. The plant has been constructed gradually; there has been no considerable new plans and new blocks of work done at any particular time, and it is altogether probable that the book accounts are correct and full as to the items of expense in these respects which were actually incurred.

The Commission has allowed for working capital about $90,000 less than was claimed by the relator, its allowance being as follows: For working capital the company should be allowed the amount

of its materials and supplies on hand, $215,443.36; plus one-eighth of its operating expenses, less taxes and uncollectible bills.   This allowance of one-eighth of the expenses is made that the company may have cash sufficient to pay its expenses for one and one-half months, the necessity for this being that there is a period of time before rates are paid during which the going expenses must be paid. While we think that the Commission has not dealt liberally in this allowance and would approve an allowance of one-sixth of the expenses, namely, the expenses for two months, we do not feel that the record requires us to send the case back to the Commission on this account.

There is further complaint that, in calculating the expenses, the Commission has failed to recognize the unusually high costs of materials, coal, oil, freight and labor existing in 1920, and to recognize that increased consumption of gas was due to unusual causes of temporary nature.   The Commission has not made full allowance for a continuation of the high cost of materials and labor, evidently believing that prices were softening, and that, within a brief period, lower prices would be had.   Of course a public service corporation ought not to be required to speculate and run chances upon the market.   On the other hand, the rate-payers ought not to be charged for a period of time at rates fixed upon excessively high prices, if those high prices are transient. The conditions following the war were as experimental as are the conditions which follow the organization of a new corporation, or a new business.  The Commission recognized that there might be sudden changes in costs, or that the high prices might continue for a longer period than it anticipated and for that reason they limited the effect of the order to six months.   At any time after six months from the establishment of the rate, May 1, 1921, either party may apply for a modification of the rates.   That six months period has already expired.   The experience has actually been had; the company can now show what its earnings have been under the rates fixed by the Commission.   If those rates have actually furnished a return less than fair, the Commission may immediately correct the mistake in such manner as to make good any losses suffered.

We have felt some hesitation as to the ruling of the Commission disallowing the Federal income tax as an expense and holding that it should be paid from that part of the revenue allowed for surplus and contingencies; also as to its refusal to allow any sum for amortizing the $20,000 judgment recovered against the company, in connection with the eight per cent rate which the Commission has allowed.   Eight per cent a few years ago might have been a fair allowance for dividends, surplus and contingencies.

At the present day, when interest rates are much higher than they formerly were, we doubt whether an eight per cent rate is sufficient. The return to investors in public service corporations should not be so small as to drive investors out of the securities. This company has been compelled to pay substantially eight per cent for money which within a short time it has borrowed. But we do not feel that the evidence in this case justifies us in saying that the allowance made by the Commission is too small. Since the company may immediately apply to the Public Service Commission for a modification of its rates, and then the actual experience of the company can be shown, and for the reasons hereinabove given, we have concluded that the determination should be confirmed, with costs.

Determination unanimously confirmed, with fifty dollars costs and disbursements.