THE STATE at Relation and to Use of CITY OF ST. LOUIS, Appellant, v. PUBLIC SERVICE COMMISSION and T. J. BROWN ET AL., Commissioners.—34 S. W. (2d) 507.

Division One, November 18, 1930.

*Julius T. Muench* and *Forrest G. Ferris, Jr.,* for appellant.

*D. D. McDonald* and *J. P. Painter* for respondents.

*Lloyd H. Landau* for St. Louis Public Service Company, Intervener.

ATWOOD, J.—For a concise preliminary statement of this case we are indebted to counsel for appellant, city of St. Louis, and quote from their statement as follows:

"This is an appeal from the judgment of the Circuit Court of Cole County, entered on March 11, 1929, affirming, on certiorari, the report and order of the Public Service Commission of Missouri, issued on June 20, 1928, in consolidated cases Nos. 1457 and 1736, entitled, 'In re Petition of the United Railways Company of St. Louis (Petition for Allowance of Increase in Revenue). Case No,

1457,' and 'In re petition of the United Railways Company of St. Louis for an increase of Fares on Petitioner's lines in St. Louis County, Case No. 1736.'

"The Commission found the fair present value of the property of the St. Louis Public Service Company (successor to United Railways Company of St. Louis, and hereinafter referred to as the 'Company'), as of January 1, 1927, to be $66,000,000, of which $63,500,000 represented the property used and useful in rendering service; and authorized an increase in the adult fare from 7 cents cash to 8 cents cash.

"This appeal challenges both the valuation and the rate of fare as fixed by the Commission.

"The Commission's order of June 20, 1928, here complained of, is based upon the company's amended application, filed with the Commission on April 9, 1927, praying for a straight 8-cent cash adult fare, and alleging, among other things:

"That the value of the company's used and useful property, exclusive of the Missouri Electric Railroad Company (not involved here), as of January 1, 1919, was fixed by the Commission at $51,781,348; that the report of the Commission's accountants filed April 2, 1927, shows that the total amount of the net expenditures made for additions and betterments to said property during the period January 1, 1919, to October 31, 1926, was $6,395,888.26; that all of said additions are used in the operation of the property; that the fair present value of the property is at least $75,000,000, exclusive of non-operating property; that the present value is not equal to the sum of the value as established by the Commission as of date January 1, 1919, plus the expenditures for additions since said date, but that the present value must be obtained in accordance with the rules of law as announced in the decisions of the Supreme Court of the United States, namely, the investment in the property, the amount expended in permanent improvements, the present value of the land, the cost of constructing the plant at such prevailing prices of materials and labor as are likely to remain at the same level for a reasonable period of time, less deduction from said reproduction cost for depreciation, as determined by actual inspection, plus a fair allowance for going value, working capital, consolidation, promotion and financing.

"The application further states that the net income available for return in 1926 was equal to but 3.31 per cent on the claimed value of at least $75,000,000, and only 4.27 per cent on the value as determined by the Commission as of January, 1, 1919, plus the net additions since (a total value of approximately $58,000,000); that the added revenue under the proposed increased fare would yield no more than $2,000,000 additional, or an annual return of six per cent on $75,000,000.

"It is further alleged that the company was entitled to an annual net return of eight per cent.

"Pending an investigation and decision, the city suggested that if the Commission believed in all fairness that there was any necessity for a temporary change in fare, it might so order, and, accordingly, on June 25, 1927, the Commission issued an order providing for a temporary 8-cent cash fare, two tokens for 15 cents, for a six months' period, and fixed the value for this period at $52,024,192.

"On April 22, 1927, the city filed its answer and protest to the Company's amended application of April 9, 1927, denying generally the Company's allegations. Certain portions of said answer were directed to the situation as it then existed, namely, the receivership, and, since the Company was subsequently reorganized, are not pertinent here. The city's conclusion was that the fair value of the used and useful property, as shown by the evidence, is $53,000,000.

"Both the city and the Company, in presenting their case to the Commission, were in substantial accord as to the general valuation theory to be followed. The Company's theory of the case is set out in paragraph 10 of its amended application, wherein it is stated that fair value is to be ascertained from the investment in the property, the amount expended in permanent improvements, the present value of the land, the cost of constructing the plant under such prevailing prices and wages as are likely to remain at the same level for a reasonable period in the immediate future, less a deduction from reproduction cost for actual, existing depreciation, ascertained by inspection, plus a fair allowance for going value, working capital, consolidation, promotion and financing.

"The city disallowed any cost of financing as a matter of law, and does not confine its ascertainment of depreciation to a physical inspection only, as is made clear in this statement of facts under 'Accrued Depreciation.' Otherwise, there is no material disagreement as to the general valuation theory upon which the case was tried.

"The city and the Company are not in agreement, however, as to the weight to be accorded these various elements of value, particularly original and reproduction cost new, less depreciation."

The record and statements presented by counsel are too long to be reviewed generally in this opinion, but in ruling appellant's assignment of errors and points urged we shall endeavor to state the pertinent facts.

The first point stated in appellant's brief is in the nature of a general definition of fair value. It reads thus:

"The ascertainment of fair present value is not controlled by artificial rules. It is a reasonable judgment, having its basis in the proper consideration of all material facts."

762

In arguing this point counsel for appellant content themselves with citation of supporting authorities and the further comment that "both the Commission and the Company recognize and plead this rule of law, but our complaint here is that the Commission (1) failed to follow it, and gave undue weight in its findings to reproduction cost, and (2) ignored the relation of value to earnings."

Appellant's second point deals with the first specification of complaint above noted, and counsel thus speak of the relation of fair present value to original and reproduction costs:

"In ascertaining fair present value, both original cost and reproduction cost must be considered and given weight, and neither original cost nor cost of reproduction is the only factor, or the controlling factor, in arriving at fair present value."

As a general statement of law this is supported by the weight of authority. [Smyth v. Ames, 169 U. S. 466, 546; Georgia Ry. & Power Co. v. Railroad Comm., 262 U. S. 625; Standard Oil Co. v. Southern Pacific Co., 268 U. S. 146, 156; San Diego Land & Town Co. v. Jasper, 189 U. S. 439, 442; St. Louis & O'Fallon Ry. Co. v. United States et al., 279 U. S. 461.] But a proper understanding of the statement may not be had without some elaboration.

The "fair value" rule, as originally announced in Smyth v. Ames, 169 U. S. 466, 546, 547, requires that consideration be given to (1) original cost of construction, (2) amount expended in permanent improvements, (3) amount and market value of bonds and stock, (4) present cost of construction, (5) probable earning capacity under rates prescribed, and (6) operating expenses. In the same connection it was also made plain that this list of matters for consideration was not intended to be all-inclusive or to exclude other relevant evidence as to value. Later decisions have brought other factors into prominence, such as (7) accrued depreciation (Knoxville v. Knoxville Water Co., 212 U. S. 1, 10); (8) market value of land (The Minnesota Rate Cases, 230 U. S. 352, 450-456); (9) working capital and (10) going concern value (McCardle v. Indianapolis Water Co., 272 U. S. 400, 412, 414); and (11) future costs of construction (Galveston Elec. Co. v. Galveston, 258 U. S. 388, 397, 398). We have recently reviewed some of the leading cases in State ex rel. City of St. Joseph v. Public Service Commission of Missouri, 30 S. W. (2d) 8. While the Supreme Court of the United States has consistently adhered to the principle announced in Smyth v. Ames, 169 U. S. 466, 547, that all matters for consideration are to be given such weight as may be "just and right" in each case, yet it has never attempted to circumscribe the honest judgment of the regulatory body by hard-and-fast formulas on the weight to be given any particular character of evidence. All competent evidence must be received and

given such weight as under the circumstances of the case is just and right. Naturally, this rule does not satisfy those who advocate any particular factor as always dominant in the determination of "fair value," or those who would arbitrarily adopt a rule of thumb in order to escape the arduous task of weighing the evidence, yet it is essentially the same rule that governs the receiving and weighing of evidence in any litigation. It follows that the stress or weight to be given the several factors that go to make up fair present value depends upon the circumstances disclosed by the evidence in the particular case. Sometimes the original cost less depreciation is a fair measure of the present value, and in such case it would be just and right to stress this factor. On the other hand, as the Supreme Court of the United States said in McCardle v. Indianapolis Water Company, 272 U. S. 400, 411, under the conditions there in evidence "the present value of lands plus the present cost of constructing the plant, less depreciation, if any, is a fair measure of the value of the physical elements of the property." Also, it may be that in one case a valuation for taxation purposes is important evidence of value (San Diego, L. & T. Co. v. Jasper, 189 U. S. 439, 443, 444), while under the facts appearing in another case (Willcox v. Consolidated Gas Co., 212 U. S. 19, 51, 52), such valuation should have little or no weight.

The gist of appellant's complaint under this head is that "the Commission did put stress upon reproduction cost." Under the doctrine above stated this assertion even if conceded is insufficient to condemn the fair value found as not "just and right." The only supporting suggestion offered by counsel for appellant is that the Commission's own finding of fair value is "97.7 per cent of its own finding of reproduction cost new less depreciation." A resume of the Commission's findings here pertinent as to operating property, shown by its report, is as follows:

Original cost of physical property other than land ..$49,355,565
Reproduction cost of physical property, other than
   land, January 1, 1927, less depreciation .......... 55,044,457
Right of way and other lands (present fair normal
   market value) ................................ 4,700,000
Franchises (actually spent) ...................... 208,522
Materials and supplies ........................... 1,442,164
Cash working capital ............................. 600,000
Going concern value .............................. 3,000,000

The Commission's finding of reproduction new less depreciation was $64,995,143, which is the the sum total of all of the above amounts except the first, and its finding of the fair present value of all property devoted to public service was $63,500,000. It is evident that the Commission gave practical consideration and substantial weight to

the factor of original cost, and we cannot on a mere mathematical comparison arbitrarily say that undue weight was given to the factor of reproduction cost less depreciation.

Counsel for appellant next present the second specification above  noted, to-wit, that the Commission "ignored the relation of value to earnings." The exact point is thus stated:

"Rates which in themselves are either so high as to cause a decrease in patronage, or are in excess of the value of the service rendered, are unreasonable, and a valuation which necessitates the collection of such rates in order to pay a theoretical return, is ecomonically unsound and contrary to the accepted rules of valuation."

We have carefully examined appellant's assignments of errors, its motion for a new trial filed in the circuit court, and its application for a rehearing presented to the Commission, and find that the proposition thus advanced was raised for the first time in appellant's printed brief under the head of "Points and Authorities." Section 10521, Revised Statutes 1919, relating to application for rehearing before the Commission, reads thus: "Such application shall set forth specifically the ground or grounds on which the applicant considers said order or decision to be unlawful, unjust or unreasonable." We have repeatedly held that such a belated specification of error will not be considered on appeal. [Lusk v. Public Service Commission, 277 Mo. 264, 272, 273, 210 S. W. 72; State ex rel. v. Atkinson, 269 Mo. 634, 647, 192 S. W. 86; Maplegreen Co. v. Trust Co., 237 Mo. 350, 362, 363, 141 S. W. 621.]

Counsel for appellant also insist that "the net balance in depreciation reserve account should be deducted from original cost." From its estimate of $55,845,678 to cover total original cost of operating property the city deducted $8,469,730, which represented the balance in the depreciation reserve fund. The Company and the Commission made no such deduction from their respective estimates of original cost. The question thus raised is relevant in view of the fact that original cost is one of the factors to be considered in fixing the fair present value. In support of their contention that such deduction should have been made counsel for the city cite Home Telephone Co. v. Carthage, 235 Mo. 644, 139 S. W. 547, 48 L. R. A. (N. S.) 1055, 1061; Brooklyn Borough Gas Co. v. Public Service Commission (N. Y. Sup. Ct.), P. U. R. 1918-F, 335, 351, 352; Railroad Comm. of Louisiana v. Cumberland Telephone & Telegraph Co., 212 U. S. 414; People ex rel. Adirondack Power & Lt. Corp. v. P. S. Comm., 200 App. Div. 268, 193 N. Y. Supp. 186, 191, 192; and In re Brookfield Electric Lt. Co., 9 Mo. P. S. C. 387, 406.

No such question was presented in Home Telephone Co. v. Carthage, supra, decided in 1911. The propriety of creating a depreciation reserve was expressly recognized by the court, but there was evidence that for two years prior to the time the case was tried $5,000 a year had been set apart out of the earnings as a depreciation fund against which no item of expense had ever been charged, and yet the plant was valued as new. Calling attention to the inconsistency of such a theory persistently adhered to the court said (1. c. 666):

"It is obvious that upon that theory a time would be reached when the depreciation fund would amount to almost the total value of the plant and yet, in determining the reasonableness of the rates, the plant, which theoretically would be the victim of almost complete 'invisible rot,' would be valued as new in determining 'the reasonable value of the property at the time it is being used for the public,' while no corresponding credit would be given for the depreciation fund on hand."

However, this is far from saying that original cost, considered only as a factor in arriving at fair present value for rate making purposes, must be diminished by the amount of depreciation reserve.

In the Brooklyn Borough Gas Company case, supra, the company did not introduce any evidence as to accrued depreciation and conceded that it should not be allowed to include its depreciation reserve fund in the amount on which it was entitled to earn a fair return. Consequently, the referee said (1. c. 352):

"The amount of the depreciation reserve has not been held in a separate fund, but has been invested in the plant and business, and the assets in which the depreciation reserve is invested are embraced in those which have been valued for the purpose of determining the rate base. Plaintiff thus has credit for all the property it uses in the public service, and there is simply deducted the amount of its own estimate of the accrued depreciation in its plant, which is the equivalent of its reserve maintained by collections from consumers."

Thus, by consent the amount of depreciation reserve was deducted in lieu of accrued depreciation regarding which there was no satisfactory evidence, but the opinion lends no support to appellant's above contention.

In the Adirondack case, supra, original cost was treated as the controlling element. The evidence showed that a depreciation reserve of $300,000 had been invested, not in "going repairs or replacement," but in "extensions and betterments." In arriving at the fair present value this amount was deducted on the theory that "it should not be used as a basis for increased rates." This theory finds support in Louisiana Railroad Comm. v. Cumberland Tel. Co., 212 U. S. 414, 424, 425, also cited by appellant, as follows:

"That it was right to raise more money to pay for depreciation than was actually disbursed for the particular year there can be no doubt, for a reserve is necessary in any business of this kind, and so it might accumulate, but to raise more than money enough for the purpose and place the balance to the credit of capital upon which to pay dividends cannot be proper treatment."

This holding is not in point, not only because it has no application to deduction of depreciation reserve from orignal cost, but because there was no evidence in the instant case that any part of the depreciation reserve was placed to the credit of capital. The balance in the depreciation reserve account as of January 1, 1919, was $2,286,631. Thereafter the Company was allowed to place $1,500,000 a year in this account. The Company's book showed that this account increased to $7,551,767 as of December 31, 1926, which amount was adjusted by the Commission's accountants to $8,469,709.56. In their brief counsel for appellant state that "Company witness Perkins testified that this $8,000,000 net balance in the Company's reserve fund had been invested in the property." While Mr. Perkins did say, "We haven't all that money actually on hand," it does not appear that it was invested in the property or in any sense made a part of the rate base. On the contrary, Mr. Perkins explained the Company's handling of the depreciation reserve account thus:

"When we take a car entirely out of service and destroy its body, there is a certain amount of salvage that we make use of for other purposes. We take the glass out of the windows; take out the lights and other parts, including motors, trucks, etc. When we think the car is no longer serviceable, we burn the body and save the steel scrap, etc., that is salvaged. Then the value of the car that is destroyed is charged out against the depreciation reserve, and the new car takes its place. It is then credited to capital account. That is the process as provided for by the classification of accounts by which we are guided.

"The amounts charged against the depreciation reserve for the last few years are as follows: In 1919, $894,233.64; 1920, $890,313.64; 1921, $1,371,941.24; 1922, $871,833.42; 1923, $788,998.34; 1924, $769,240.42; 1925, $789,532.92; 1926, $659,426.58. . . .

"When we reconstruct outright a stretch of track, or a considerable stretch of track, we charge the actual replacement cost of the track as it was to the reserve, and the cost of the improvement of the track, such as greater weight of rail, etc., to additions and betterments; but when a car is destroyed, that car, according to the classification of accounts, is simply charged outright to the depreciation reserve.

. . .

"The receiver has been placing $1,500,000 a year in the depreciation reserve. We haven't set this aside into an actual separate cash

pocket. We have made a bookkeeping entry of that amount, and that amount is charged as a liability.''

The evidence amply justified the Commission's finding that the Company had spread its retirements in the proper manner, and that the property had been efficiently operated.

In the Brookfield Electric Light Company case, last above cited by appellant, the unused balance in the depreciation reserve was deducted from original cost in arriving at a sum ''which might be considered another measure of the fair present value.'' However, no supporting authority is cited and we have been unable to find any. In this respect the case is contrary to a previous announcement of the Missouri Public Service Commission (Charleston Com. Club v. Missouri Pub. Util. Co., 2 Mo. P. S. C. 311, 323), and was not subsequently followed.

Appellant's entire argument under this head proceeds on the theory that the Company's investment represented by original cost is diminished by the accumulation of a depreciation reserve account. As well said in Whitten-Wilcox, Valuation of Public Service Corporations (2 Ed. 1928), page 1720: ''It is clear that the amount of original investment devoted to public service is undiminished by the accumulation of a reserve unless the reserve is turned over to the investors as free capital to use as they please.'' Such was not done in this case. For a number of years the Company was permitted to set aside $1,500,000 a year to this account, but it was required to show, as at this hearing, that the property was efficiently maintained and this fund properly used to meet property retirements and furnish necessary replacements. An annual depreciation reserve account differs from actual accrued depreciation in that the former is an estimate looking to the future while the latter is a determination of what has occurred in the past. If both could be ascertained with absolute accuracy, at the end of the life of the property each would equal the other. In practice they are never the same at any given time during the life of the property. The depreciation reserve is laid up against an estimated impending retirement of property devoted to public service when it no longer efficiently serves that purpose and necessarily implies an available balance, which generally speaking, and in this case, is a matter of bookkeeping and not a sum impounded or turned over to the utility for use without regard to the purpose for which its collection was authorized. Even an excessive accumulated depreciation reserve cannot be drawn upon to piece out a rate otherwise confiscatory (Board of Commrs. v. N. Y. Tel. Co., 271 U. S. 23, 31), and the manner in which money collected for depreciation reserve is employed pending its actual application to retirements is not necessarily a hardship to the consumer unless it is used to work a duplication in the rate base. The amount

768

of the annual depreciation charge to make up this reserve is a question of fact. [Georgia Ry. Co. v. Railroad Comm., 262 U. S. 625, 633.] In this case at the hearing in question it was reduced from $1,500,000 to $800,000 a year. In arriving at the factor of reproduction cost new, the Commission deducted actual accrued depreciation to the extent of 25 per cent, exceeding by far the amount of the depreciation reserve balance. To deduct the depreciation reserve balance from original cost would be to destroy the identity of that factor. The result would not be original cost. In the foregoing assignment of error applicant has invoked an unauthorized procedure to remedy an evil not shown to exist. The assignment is overruled.

Appellant's fifth point deals with the subject of accrued depreciation. The Commission adopted the city's theory but allowed only 25 per cent of actual accrued depreciation, whereas the city contended for 29 per cent. The Company insisted that the same property had depreciated only 16 per cent. Appellant quotes at length from the conclusions embraced in the Commission's report, wherein the physical inspection of the property by some of the Company's witnesses is characterized as superficial, and from this concludes that the Commission "failed to give sufficient weight to the city's testimony." The result reached by the Commission shows that it gave great weight to the city's testimony, although the Commission's report also stated that "the city's testimony shows that a portion of the property was not seen or inspected by it." On the record presented we find no merit in this assignment.

Counsel for appellant next say that in arriving at fair value the Commission "entirely ignored the fact that the future price trend or level of prices is decidedly downward, all of which was demonstrated both by the Company's exhibits (Nos. 3, 3A and 3B) and by the city's uncontradicted testimony." Mr. Doyne, testifying for the city, did say that for the past few years there had been a gradual decrease and that "the trend is gradually coming down," but the city's Exhibit 9a shows little deviation from a comparative level in construction costs for 1923, 1924, 1925 and 1926. We have also carefully examined the other exhibits above mentioned and find that instead of showing a "decidedly downward" trend in construction costs they indicate no sharp rises or declines for the last several years shown and present a comparatively level plateau of prices. It does not appear that the Commission failed to make "an honest and intelligent forecast of probable future values" upon a view of all the relevant circumstances, as required in such cases. [State ex rel. Southwestern Bell Tel. Co. v. Public Service Commission, 262 U. S. 276, 288.]

Appellant also complains because the Commission in this case allowed $3,000,000 for going value. This element is defined in the Commission's report as "an added allowance for the fact that a property with its business attached and in successful operation, has a greater value than the same property ready to operate, but not operating, and without any attached business." The company claimed an allowance of $2,500,000 as going value in its original cost appraisal, and $8,700,000 in its reproduction cost appraisal. The city estimated $2,500,000 for total going value, which was the amount allowed in the 1919 case. It offered no evidence on the subject, but now insists that the amount allowed is excessive by at least $500,000. The only evidence offered was by the Company and it tended to support a sum largely in excess of the amount allowed. The city, having conceded the propriety of allowing something for going value, is in no position to complain because the Commission finally allowed less than the evidence warranted. [Westinghouse Electric & Mfg. Co. v. Denver Tramway Co., 3 Fed. (2d) 285, 298.]

Appellant's next point is covered by the following assignment of error:

"The court erred in affirming the Commission's finding that the fair present value of the used and useful land is $4,700,000, it appearing from the evidence that the value of said land does not exceed $3,194,518."

It is said that while accepting the city's theory that "the value of the utility's land is its fair market value, without the addition of hypothetical costs, as measured by the fair average of the normal market value of land in the vicinity having a similar character," indicated in the Minnesota Rate Cases, 230 U. S. 352, 455, it "gives weight to the utility's estimates, and rejects, in part, those made by the city."

The following tabulation presents a comparison of the valuations of used and useful land (practically the same tracts) both in the 1919 case and in the present case:

| 1919 Valuation | | 1927 Valuation | | |
| Company | Commission | Company | City | Commission |
|---|---|---|---|---|
| Operating land— | | | | |
| $3,809,601 | $2,672,209 | $5,720,218 | $3,194,518 | $4,700,000 |

The Commission's own approach is indicated in the conclusions stated in its report insofar as they relate to right-of-way appraisals, from which we quote as follows:

"Two different sets of facts and assumptions result in two rather widely varying estimates by the city and the Company with respect to the value of the right-of-way of the latter as of January 1, 1927. The difference in the basic facts is the outcome of expressed differences of opinion as to the market value of land adjoining and

contiguous to the right-of-way of the Company. Both the city and the Company claim to have appraised this adjoining and contiguous land on the basis of its market value for ordinary community purposes, disregarding the special use to which the land is or may be put, and disregarding also consequential damages, costs to acquire and excess costs of any other nature. Differences in assumptions by the city and the Company, which lead to further disparity in the final figures reached for the value of right-of-way, may be summed up as follows:

"The Company has determined from the appraisal figures placed on adjacent and contiguous lands, the average unit value of such lands, and has applied to its right-of-way holdings the average unit values as indicated by the unit value determination of similarly situated adjoining and contiguous land.

"The city, on the other hand, has assumed that where the right-of-way adjoins the rear end of property, the unit value to be assigned to the right-of-way area is the average value for the rear portion of the lot, and where the right-of-way is along the front of a lot, the city has applied to the right-of-way area in that particular section or zone, the average unit value assignable to the front portion of the lot. . . .

"The right-of-way holdings of the St. Louis Public Service Company (formerly United Railways Company of St. Louis), in the city of St. Louis, are of three general types. (1) Strips along the street frontage of public property, bordered on one side by a public street or highway, and abutted on the other side by property of a private or special public character, such as the right-of-way of the Market line, along the southerly boundary of Forest Park in St. Louis. (2) Right-of-way, consisting of a reserve strip in the center of a public street or highway. (3) Right-of-way bordered on one or both sides by interior or rear lot property, or a private or public alley.

"Right-of-way holdings falling under types 1 and 2 will, under the city's theory of right-of-way appraisement, take on unit values in excess of the average unit value of similar and adjacent land. Right-of-way which may be classed as type 3 will, under the city's theory, for the most part, perhaps, take on unit values less than the average unit values of adjacent lands. The Hodiamount right-of-way partakes of the nature of both types 1 and 3.

"The right-of-way of the Company located outside of the city of St. Louis, partakes of much the same general character as the right-of-way within the city. There is, of course, a considerable amount of right-of-way in St. Louis County, which extends through unplatted lands.

"In the absence of opinion based on personal knowledge as to the fair market value of the lands owned by the Company, and being

almost without means by which values may be analyzed and recalculated, the Commission is forced to base its judgment as to land values on the testimony offered in the case, and an impartial weighing of the evidence before it.

"There are certain rules the Commission must keep in mind in its determination of land values.

"Our courts have said companies are entitled to a reasonable share in the prosperity of a community, and that lands must be included at their increased value; that this increase, so allowed, cannot be more than the fair average of the normal market value of land in the vicinity having a similar character; that the use of multipliers, or otherwise, to cover hypothetical outlays cannot be considered, and that it is error to base estimates of value of right-of-way and other lands upon the so-called 'railway value' of property. [See Minnesota Rate Cases, 230 U. S. 352, 57 L. Ed. 1563.]"

The Commission then expressed its approval of the city's "rear-lot" or "front-lot" theory of appraisal of right-of-way, and its disapproval of assuming "an average sized lot to which shall be applied front-foot values of lots varying in depth," as well as its disapproval of the use of the selling price of a lot acquired for some special purpose as a measure of value, and other unspecified methods and theories of arriving at land values indicated by some of the Company's witnesses.

Apart from the Company's methods and theories of valuation which were criticized by the Commission and the city, and independent of the propriety of the Commission's action in treating as non-operating land certain tracts valued by the Company at $426,411, although conceded to have been in use on January 1, 1927, was the Commission's duty to weigh all the competent evidence. We cannot say from the record presented that the Commission did not properly perform this duty, and the fact that it may have rejected in part some of the city's estimates does not necessarily impeach the Commission's finding. In a question of rate-making there is a strong presumption in favor of the conclusions reached by an experienced administrative body after a full hearing (Darnell v. Miss. Railroad Comm., 244 U. S. 564, 569), and in this case there was ample evidence to support the Commission's finding.

Appellant also asserts that "the Commission erred in its findings of value to the extent that it included therein, as a part of the original cost, $2,700,000 for promotion and consolidation, it appearing from the evidence, and upon any reasonable theory, that such allowance should not exceed $2,000,000."

The city's estimate for promotion and consolidation was $2,000,000, included in its original cost estimate. It offered no supporting evi-

dence. In the 1919 case the Commission found $2,700,000 to be a fair allowance for promotion, consolidation and financing. In the present case the city arrived at the sum of $2,000,000 by deducting $700,000 from the $2,700,000 allowed in 1919, being its own estimate of the part then allowed for financing. The Company's estimates for promotion and financing were $2,700,000 included in original cost, and $2,090,000 for promotion and $4,180,000 for financing, both included in reproduction cost. Company witnesses testified that an amount equivalent to two to 2½ per cent of the value of the property was necessary for promotion and five per cent for financing. The Commission's allowance of $2,700,000 for promotion and consolidation in its estimate of original cost is thus referred to in its report:

"The original cost of this property contains without doubt some costs incurred in connection with the promotion and consolidation of the properties.

"The Commission in its report and order in this case decided June 4, 1923 (13 Mo. P. S. C. 522), found it impossible to determine the actual amounts of such costs, but from a study of the history of the property, the Commission concluded that $2,700,000 was a reasonable allowance for promotion, financing and consolidation costs.

"The testimony at that time showed that the present car rider had been greatly benefited by the numerous consolidations that had been effected.

"This Commission has expressed its position relative to costs and financing in a number of cases. Bond discount and commissions, insofar as they were a part of interest during construction, are properly chargeable to capital account, but beyond that, the cost of financing, or of assembling capital should not be included in a valuation for rate-making purposes. [See Aluminum Goods Mfg. Co. v. Laclede Gas Light Company, and citations therein, 16 Mo. P. S. C. Advance Sheet 1.]

"There is no way of determining how the sum of $2,700,000 was determined, but this Commission is of the opinion, after a careful review of the evidence, that the amount of this item should not be disturbed and that said amount of $2,700,000 is allowed for costs of promotion and consolidation."

Promotion and consolidation expenses may be allowed in actual cost, but not in reproduction cost estimates. [Whitten-Wilcox, Valuation of Public Service Corporations (2 Ed.) 1086, 1091; Aluminum Goods Mfg. Co. v. Laclede Gas Light Co., 16 Mo. P. S. C. 114, 170, 171.] Appellant concedes the propriety of so allowing $2,000,000, but contends that the evidence does not support an allowance of $2,700,000. While, as stated by the Commission in its report, there is no way of determining how the sum of $2,700,000

was arrived at in the 1919 case, yet in deciding in this case that the same amount should be allowed for costs of promotion and consolidation, it might well have applied the evidence at hand authorizing a computation of 2½ per cent on $46,655,565, its estimate of the total cost of fixed physical property, other than land, as of January 1, 1927, to cover promotion expense, and concluded that the remainder of the $2,700,000 would not more than equal the consolidation expense included in the 1919 estimate, the Commission's report in that case (13 Mo. P. U. R. 586) showing that its engineer, Mr. Harrop, in his estimate allowed more than $4,000,000 for only the items of promotion and consolidation costs.

Appellant also insists that the Commission in its allowance of 17½ per cent for overhead construction in its estimate of reproduction cost gave sufficient weight to the elements of promotion and consolidation. It is proper, as above stated, to allow for these elements in an estimate of original cost. Furthermore, the city having conceded the propriety of allowing $2,000,000 therefor in the original cost estimate will not now be heard to contend that no allowance should be made.

Appellant's next point relates to the Commission's allowance for construction overhead costs. Allowances made for this element in the various cost estimates of operating property appear as follows:

ORIGINAL COST.

|  | City | Company | Commission |
|---|---|---|---|
| Undistributed Construction Costs, | $4,740,000 | $5,193,688 | $5,216,166 (exclusive of overheads on retirals and additions since 1919, which are included in other totals.) |

REPRODUCTION COST.

|  | City | Company | Commission |
|---|---|---|---|
| Undistributed Construction Costs, | $8,972,564 | $13,347,325 | $10,980,814 |

The above amount of $5,216,166 allowed by the Commission in its original cost estimate consists of $4,740,700, which is fifteen per cent of $31,604,665, the estimated value of property in the 1919 inventory remaining as of January 1, 1927, and $475,466, which is five per cent of $9,509,320, the estimated value of gross additions, other than land and overheads, since January 1, 1919, based on the Commission's audit.

As stated in the Commission's report, both the city and the Company agreed that fifteen per cent was a fair allowance for construc-

tion overhead costs when applied to the original cost estimate. The Commission's allowance for construction cost overhead in its original cost estimate exceeds that allowed by the city by the sum of $475,466, or five per cent of the value of additions since 1919. The city offered no evidence and now objects to any separate allowance for overheads on the additions since 1919 on the ground that "the amount of these additions, as shown by the Company's books, were added to the original cost; and whatever overheads, if any, were properly a part of these additions, were necessarily included in the original cost when they were added thereto in the exact sum shown on the Company's books." In support of the position thus taken appellant refers us to the city's Exhibit 8 wherein the sum of $9,509,320 is set forth as representing "Gross Additions and Betterments, January 1, 1919, to January 1, 1927, at actual cost (Mo. P. S. C. Audit including overheads segregated from Operating Expenses)." Turning to the audit mentioned, Commission's Exhibit 1, we read the following under the head of Indirect and Overhead Construction Costs:

"With the exception of shop overheads, the Company did not charge any indirect or overhead construction costs to the plant account, such items having been included in operating expenses.

"As shown in Item 15, Statement No. 2, we have transferred certain proportions of certain indirect costs to the plant account. However, with respect to

"Transportation of men on revenue cars,

"General office or administrative expense, and

"Interest during construction,

we were unable to secure sufficient data to make such a transfer. But such items, in connection with additions and betterments, usually are not large."

From the foregoing it is plain that the Company did not charge "any indirect or overhead construction costs to the plant," and the Commission's audit by no means included all of them. Nor is it material that they were not so charged on the Company's books. [Monroe Gas Light & Fuel Company v. Michigan Public Utilities Commission, 292 Fed. 139, 148.] They were very conservatively dealt with in the Commission's report as follows:

"It is common knowledge that overhead construction costs are incurred during the construction of a property such as this. The Company has estimated general supervision during the construction of property placed since January 1, 1927, was included in the adjusted audit to the amount of $220,541. The audit of the Commission's accountants shows that any construction overhead costs that were incurred were charged to operating expenses, and with respect to administrative expenses or interest during construction, there was insufficient data to make a separation.

"It is, therefore, indicated that there were so-called overhead construction costs incurred during the period from January 1, 1919, to January 1, 1927, but the Commission is of the opinion that such costs were not as much as fifteen per cent of the cost of said additions. There would not be the item of omissions and contingencies, since the audit reflects the total cost of specific construction; there would not be any cost for taxes, and very small costs for interest, due to the additions being placed piece-meal, and the period of construction being short.

"The Commission is of the opinion an allowance of five per cent to cover construction overhead costs applicable to the additions to the Company's property from January 1, 1919 to January 1, 1927, is fair and reasonable in the determination of the original cost of said property."

What has been said regarding failure of the city to allow for construction overhead on additions since 1919 in original cost estimate applies with equal force to its failure to make such allowance in the reproduction cost estimate. Aside from this item the allowances of the city and the Commission for construction overheads in reproduction cost are not far apart, one having allowed seventeen per cent and the other 17½ per cent of the valuations respectively considered.

Appellant's eleventh and last point is that "a return of not exceeding seven per cent upon the fair value of the property used and useful, and necessary in rendering service to the public, is reasonable and just to both the utility and its patrons." In support of this claim appellant has cited a number of cases in which a return of six per cent was not held to be confiscatory, but in Dayton-Goose Creek Railroad Co. v. United States, 263 U. S. 456, 486, it was held that even the question of the minimum of a fair percentage on value varies with the circumstances. However, there is no claim that the rate here allowed is confiscatory and the cases cited are not applicable. Appellant says that the rates herein allowed will yield a return of 8.65 per cent, but this rests upon the assumption that the fair value of $63,500,000 allowed by the Commission is excessive and that the fair value is in reality not more than $53,000,000. We have already held that this assumption is not supported by the record before us. Many cases might be cited in which courts have held a return of eight per cent to be fair and reasonable. [Brush Electric Company v. Galveston et al., 262 U. S. 443, 445; Mobile Gas Company v. Alabama Public Service Comm., 293 Fed. 208, 221; Alton Water Company v. Ill. Commerce Comm., 279 Fed. 869, 873; New York Tel. Co. v. Prendergast, 300 Fed. 822, 826.] In this case the Commission estimated that the rate of return would be 7.14 per cent. We are not prepared to say that such rate is unreasonable.

The Company has briefed and earnestly urged a number of propositions which we have not deemed it necessary to discuss for the reason that the Company has not appealed from the Commission's order.

For the reasons above stated the judgment is affirmed. All concur.